UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

EXHIBIT
B

ASD SPECIALTY HEALTHCARE, LLC )
d/b/a BESSE MEDICAL, )
)
Plaintiff, )
)
v. )                      Civil No. 1:23-cv-00201-NT
)
VISION CARE OF MAINE, Limited )
Liability Company, and )
CURT TYLER YOUNG, )
)
Defendants

**DEFENDANT DR. CURT TYLER YOUNG'S MOTION TO EXTEND SUMMARY JUDGMENT DEADLINES AND DEADLINE TO SUBMIT POSITION ON WHETHER CASE SHOULD BE ADMINISTRATIVELY CLOSED**

Defendant Curt Tyler Young, M.D. ("Dr. Young") requests that this Court, pursuant to Rule 6(b) of the Federal Rules of Civil Procedure, extend the pending deadlines related to the Motion for Partial Summary Judgment filed by Plaintiff ASD Specialty Healthcare, LLC d/b/a Besse Medical ("Besse") [D.E. 55] and the deadline set by the Court's August 6, 2024 Order [D.E. 70] inviting the parties to submit their positions on whether the case should be administratively closed as a result of Defendant Vision Care of Maine, Limited Liability Company's ("VCOM") suggestion of bankruptcy.

1.    On August 5, 2024, Defendant VCOM filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code with the United States Bankruptcy Court for the District of Maine (the "Bankruptcy Court"). VCOM filed a Suggestion of Bankruptcy in this action on the same day [D.E. 69].

1

2.     On August 6, 2024, this Court set a deadline of August 20, 2024, for the remaining parties, Plaintiff Besse and Defendant Dr. Young to submit their positions as to whether the case should be administratively closed as a result of VCOM's Suggestion of Bankruptcy [D.E. 70].

3.     Today, on August 8, 2024, VCOM filed with the Bankruptcy Court a Complaint and Motion for Order Granting Preliminary Injunctive Relief in Favor of Plaintiff and Against Defendant and Incorporated Memorandum of Law (the "Motion for Preliminary Injunction"). A copy of the Motion for Preliminary Injunction is attached hereto as Exhibit A.  For relief, the Motion for Preliminary Injunction requests, inter alia, that the Bankruptcy Court:

> pursuant to 11 U.S.C. §§ 105(a), 362(a)(3) and (6), 47 U.S.C. § 151 *et. seq.*, Fed. R. Civ. P. 65, and Fed. R. Bankr. P. 7001(7) and 7065, enter an order extending the automatic stay to the Debtor's sold member and manager, Curt Tyler Young, M.D. ("Dr. Young") and/or enjoining and restraining ASD Specialty Healthcare, LLC d/b/a Besse Medical ("Defendant" or "Besse") from continuing to prosecute certain litigation currently pending against Dr. Young in the United States District Court for the District of Maine, Docket Number 1:23-cv-00201-NT (the "District Court Action") until confirmation of a Chapter 11 plan or further order of this Court.

4.     A hearing on the Motion for Preliminary Injunction in the Bankruptcy Court has been set for September 5, 2024.

5.     If the Bankruptcy Court grants VCOM's Motion for Preliminary Injunction and grants the relief requested, Besse will be enjoined from proceeding in this action against Dr. Young pending conclusion of VCOM's Chapter 11 case.  In that event, this action will likely be administratively closed as a result of that relief and Dr. Young will not be responding to the Motion for Partial Summary Judgment filed by Besse.  Additionally, the pendency of the VCOM Chapter 11 case may lead to productive settlement discussion among the parties.

6.     In the interest of judicial economy, rather than simultaneously briefing in both the Bankruptcy Court and this Court the issue of whether the automatic bankruptcy stay of proceedings against the Debtor (VCOM) should be extended to Dr. Young, Dr. Young respectfully requests

that this Court stay the deadline to submit his position on whether this case should be administratively closed until at least fourteen days after the Bankruptcy Court has made a decision on the Motion for Preliminary Injunction.

7.      In the event the Bankruptcy Court does not grant the relief VCOM seeks in the Motion for Preliminary Injunction, Dr. Young reserves the right to make all available arguments in support of staying and/or administratively closing this case in this Court.

8.      Also in the interest of judicial economy, rather than requiring a response to the Motion for Partial Summary Judgment that may be moot if this case is closed, Dr. Young respectfully requests that this Court stay the pending summary judgment briefing deadlines until after this Court has decided whether this case should be administratively closed.  In the event this Court orders that this case should *not* be administratively closed, Dr. Young reserves the right to respond to Besse's Motion for Partial Summary Judgment and respectfully requests that his deadline to file opposition to Besse's Motion for Partial Summary Judgment be extended until at least 21 days after the date of any such order.

Dated:        August 8, 2024                    /s/ Meredith C. Eilers
                                                Meredith C. Eilers, ME Bar No. 4923
                                                OLAFSEN & EILERS, LLC
                                                75 Pearl Street, 2nd Floor
                                                Portland, ME 04101
                                                (207) 232-6304
                                                meilers@olafseneilers.com

                                                *Attorney for Curt Tyler Young*

## CERTIFICATE OF SERVICE

I, Meredith C. Eilers, hereby certify that I am over eighteen years old and caused a true and correct copy of the foregoing document to be served electronically on the parties receiving service in this case through the Court's CM/ECF electronic filing system on August 8, 2024.

DATED:  August 8, 2024                    /s/ Meredith C. Eilers
                                          Meredith C. Eilers

**Exhibit A**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| VISION CARE OF MAINE, LIMITED | ) | Chapter 11 |
| LIABILITY COMPANY, | ) | Case No. 24-10166 |
| | ) | |
| Debtor . | ) | |
| _____ | ) | |
| | ) | |
| VISION CARE OF MAINE, LIMITED | ) | |
| LIABILITY COMPANY, | ) | Adversary No. 24-  _____ |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| ASD SPECIALTY HEALTHCARE, LLC, | ) | |
| d/b/a BESSE MEDICAL, | ) | |
| | ) | |
| Defendant. | ) | |

**MOTION FOR ORDER EXTENDING AUTOMATIC STAY TO NON-DEBTOR AND/OR GRANTING PRELIMINARY INJUNCTIVE RELIEF IN FAVOR OF PLAINTIFF AND AGAINST DEFENDANT AND INCORPORATED MEMORANDUM OF LAW**

***Expedited Relief is Requested***
***D.Me. LBR 9013-4(a)(2)(B)***

Vision Care of Maine, Limited Liability Company ("Plaintiff"
or the "Debtor") by and through its undersigned counsel, hereby requests that the Court,
pursuant to 11 U.S.C. §§ 105(a), 362(a)(3) and (6), 47 U.S.C. § 151 *et. seq.*, Fed. R.Civ.P.
65, and Fed.R.Bankr.P. 7001(7) and 7065, enter an order extending the automatic stay to
the Debtor's sole member and manager, Curt Tyler Young, M.D. ("Dr. Young") and/or
enjoining and restraining ASD Specialty Healthcare, LLC, d/b/a Besse Medical
("Defendant" or "Besse") from continuing to prosecute certain litigation currently
pending against Dr. Young in the United States District Court for the District of Maine,

Docket Number 23-cv-00201-NT (the "District Court Action") until confirmation of a

Chapter 11 plan or further order of this Court.

## Introduction

1.      The purpose of this Motion is to ensure that the Debtor has the full

attention and undiminished work product of Dr. Young, whose daily work as one of

Maine's few ophthalmologists is essential to the Debtor's business and the eye health of

hundreds of people in Northern Maine. Specifically, without materially prejudicing any

other party, the relief requested in this motion will relieve the pressure on Dr. Young that

will otherwise come from having to simultaneously: (1) guide the Debtor through this

Chapter 11 proceeding—requiring negotiation with secured and unsecured creditors,

obtaining DIP financing, and formulation, filing and confirmation of a plan of

reorganization involving resolution, via compromise or litigation, of a multimillion dollar

claim by one of the Debtor's vendors, Besse; (2) defend himself in the U.S. District Court

in his capacity as a personal guarantor on Besse's claim against the Debtor, including by

responding to a motion for summary judgment in the pending litigation; and (3) continue

to meet the day-to-day demands of a being both an actively practicing physician and

surgeon for hundreds of patients, as well as overseeing the operations of both the Debtor

and another (non-Debtor) medical practice, Vision Care of Maine – Aroostook, LLC

("Aroostook"). *Declaration of Curt T. Young, M.D.* (the "Young Declaration") ¶¶ 7, 12-

14.

2.      Dr. Young's weekly workload includes performing approximately 50

ophthalmic surgeries and conducting anywhere from 250 to 400 clinical visits. *Id.* at ¶ 13.

In addition to his clinical and surgical responsibilities, Dr. Young manages both the

Debtor's and Aroostook's surgery center, which entails reviewing all patient charts,

conducting peer reviews, and managing and overseeing nurses and other professional providers. *Id.* at ¶ 14.

3. "[C]ases have long recognized that bankruptcy courts may enter a preliminary injunction that operates to stay actions against non-debtors. Courts have at times described the authority to enter such a preliminary injunction as the power to 'extend the stay.'" *In re Parlement Technologies, Inc.*, Case No. 24-10755, 2024 WL 3417084, (Bankr. D. Del. July 15, 2024). *See In re Slabicki*, 466 B.R. 572, 580 (B.A.P. 1st Cir. 2012); *In re Conway,* Case No. 24-10126-7, Adv. No. 24-00034, 2024 WL 3492689 (Bankr. W.D. Wis. July 19, 2024). ("[T]he cases have long recognized that bankruptcy courts may enter preliminary injunctions that operate to stay actions against non-debtors and to enforce the automatic stay.").

4. As the court explained in *In re Conway*:

> The jurisdiction of the bankruptcy court to stay actions in other courts extends beyond claims by and against the debtor, to include "suits to which the debtor need not be a party but which may affect the amount of property in the bankrupt estate," *Zerand-Bernal Group, Inc. v. Cox*, 23 F.3d 159, 161–62 (7th Cir. 1994), or "the allocation of property among creditors." *In re Memorial Estates, Inc.*, 950 F.2d 1364, 1368 (7th Cir. 1991); *see also Black v. United States Postal Serv. (In re Heath)*, 115 F.3d 521, 524 (7th Cir. 1997) ("related to" means "likely to affect").

> To protect this jurisdiction, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," 11 U.S.C. § 105(a), including a stay. *Zerand-Bernal*, 23 F.3d at 162; *Fisher v. Apostolou*, 155 F.3d 876 (7th Cir. 1998). "[A] bankruptcy court can enjoin proceedings in other courts when it is satisfied that such proceedings would defeat or impair its jurisdiction over the case before it. In other words, the court does not need to demonstrate an inadequate remedy at law or irreparable harm." *Fisher*, 155 F.3d at 882 (citing *In re L & S Indus., Inc.*, 989 F.2d 929, 932 (7th Cir. 1993). "Of course, the moving party must still establish a likelihood of success on the merits." *L & S Indus., Inc.*, 989 F.3d at 932.

*In re Conway,* 2024 WL 3492689, at * 3.

5.      As detailed below, notwithstanding the United States Supreme Court's decision in *Harrington v. Purdue Pharm L.P.*, 603 U.S. --, 144 S. Ct. 2071 (2024), which barred underline permanent injunctive relief in the form of a mandatory release of claims against non-debtors, preliminary injunctive relief is still available if certain elements can be met:

> a preliminary injunction may still be granted if the Court concludes that (a) providing the debtor's management a breathing spell from the distraction of other litigation is necessary to permit the debtor to focus on the reorganization of its business *or* (b) because it believes the parties may ultimately be able to negotiate a plan that includes a consensual resolution of the claims against the non-debtors.

*In re Parlement*, 2024 WL 3417084 at * 1 (emphasis in original); *see In re Coast to Coast Leasing, LLC,* No. AP 24-00172, 2024 WL 3454805, at **3-4 (Bankr. N.D. Ill. July 17, 2024) (post-*Purdue Pharma*, issuing temporary (but not permanent) restraining order enjoining creditors of the debtor from pursuing principals of the debtor who had guaranteed its debts because, *inter alia*, those principals intended to fund the debtor's plan and "their credit will play a vital role in the reorganization efforts.").

6.      To quote *Parlement*, Dr. Young and the Debtor need the "breathing spell from the distraction of other litigation … to permit the debtor to focus on the reorganization of its business …." *See In re Parlement*, 2024 WL 3417084 at * 1. As discussed below, that "breathing spell" would also carry important benefits to the Debtor's patients.

7.      In addition, while settlement discussions to date have not led to resolution of the Besse claim, it is entirely possible that, in the context of this bankruptcy proceeding, "the parties may ultimately be able to negotiate a plan that includes a consensual resolution of the claims against the non-debtors." *See In re Parlement*, 2024 WL 3417084 at * 1.

4

8.      On August 5, 2024 (the "Petition Date"), the Debtor filed its petition for relief under Chapter 11 of the Bankruptcy Code.  As a result of that filing, the Debtor is now a debtor-in-possession with authority to operate its business pursuant to §§ 1107 and 1108 of the Code. On August 8, 2024, the Debtor also filed its *Complaint for Declaratory and Injunctive Relief with Respect to the Validity, Extent, and Priority of ASD Specialty Healthcare, LLC d/b/a Besse Medical's Security Interest in Property of the Estate*, initiating this lawsuit and seeking, *inter alia*, the injunctive relief discussed herein.

### Operative Facts and Relevant Procedural History

9.      As noted above, the Debtor filed its petition for relief under Chapter 11 of the U.S. Bankruptcy Code, on August 5, 2024.

10.     The Debtor provides primary eye care, optical services, glaucoma treatment, and ophthalmic surgical services including LASIK, cataract surgery, retina surgery, and corneal surgery. Young Declaration at ¶ 9. Dr. Young is the President and Medical Director of the Debtor and is the sole Member and Manager. *Id.* at ¶ 2.

11.     Dr. Young regularly works approximately 60 hours per week between Aroostook and VCOM. *Id.* at ¶ 13. This includes performing approximately 50 ophthalmic surgeries and conducting clinical visits with between 250 and 400 patients each week *Id.*

12.     In a regular work week, Dr. Young sees patients in Bangor on Monday and performs surgeries in Bangor on Tuesday morning. *Id.* at ¶ 12. On Tuesday afternoons, he travels to Debtor's Lincoln facility to see patients. *Id.* On Wednesdays, Dr. Young travels to Aroostook's Presque Isle location where he performs surgeries and sees patients. *Id.* On Thursdays, he travels to Madawaska to see patients before returning to Bangor to see patients on Fridays. *Id.*

13.     Dr. Young is one of the only general ophthalmologists at both Debtor and Aroostook's facilities. *Id.*  at ¶ 17. Maine has a shortage of ophthalmologists and Aroostook is the only facility providing retina ophthalmologists services to patients living north of Bangor. *Id.* at ¶¶ 18-19.

<u>**Argument**</u>

14.      "The paramount objective of a Chapter 11 reorganization is to rehabilitate and preserve the value of the financially distressed business." *Mason v. Official Comm. of Unsecured Creditors (In re FBI Distrib. Corp.)*, 330 F.3d 36, 41 (1st Cir. Mass. 2003). The automatic stay was created to further that policy goal. *See e.g., McMullen*, 386 F.3d at 324.

15.     Although the automatic stay does not ordinarily extend to separate legal entities or to codefendants in pending litigation, courts in this Circuit have extended similar protections by means of a preliminary injunction to a non-debtor. *See*, *e.g. Slabicki*, 466 B.R. at 580; *BMO Harris Bank N.A. v. Tally Transportation, LLC*, 2024 WL 914238 *3 (D.Mass. January 18, 2024). This is consistent with holdings across the country. *See e.g., A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1007 (4th Cir. 1986), *cert. denied*, 479 U.S. 876, 107 S. Ct. 251 (1986); *Coast to Coast Leasing, supra; Parlement, supra*; *In re Philadelphia Newspapers, LLC*, 407 B.R. 606, 616 (Bankr.E.D.Pa. 2009); *In re Kanawha Trace Dev. Partners*, 87 B.R. 892, 897 (Bankr.E.D.Va. 1988).

**A.     The Debtor Has Demonstrated "Unusual Circumstances" Sufficient to Extend the Stay to Dr. Young.**

16.     The circumstances in which courts will extend the stay, which the First Circuit describes as "unusual," arise when "(i) the non-debtor and debtor enjoy such an identity of interests that the suit of the non-debtor is essentially a suit against the debtor, <u>or (ii) the third-party action will have an adverse impact on the debtor's ability to</u>

accomplish reorganization." *BMO Harris Bank N.A*, 2024 WL 914238 at *3 (quoting *Slabicki*, 466 B.R. at 580) (emphasis added). In addition to situations involving concern about interference with a debtor's reorganization issues, courts have also found that situations where the debtor owes potential contractual duties to indemnify the non-debtor can constitute unusual circumstances. *Philadelphia Newspaper*, 406 B.R. at 616; *BMO Harris,* 2024 WL 914238 at ** 3-4; *see also In re R&G Financial Corp.* 441 B.R. 401, 410 (Bankr. D.P.R. 2010) (finding that because the identity of interests of the debtor and non-debtor are in essence merged, the "unusual circumstances" to extend the protection of the automatic stay to the non-debtor are present). Here, both of those concerns are implicated.

17.    First, Dr. Young is absolutely critical to the successful operations of the Debtor, and the rehabilitation of the Debtor's business. Young Declaration at ¶¶ 15-17. Ensuring that he is not required to simultaneously operate the Debtor, manage his and his co-worker physicians' ophthalmology practices, navigate the bankruptcy process, and litigate what is functionally the same Besse claim in both this case and in the District Court, is a critical step in ensuring that the Debtor has that opportunity to successfully reorganize.[1]    Put another way, and like the debtor's principals in *Coast to Coast,* Dr. Young "will play a vital role in the reorganization efforts." *See* 2024 WL 3454805, at **3-4.

18.    Dr. Young regularly works 60 hours per week on behalf of Debtor and Aroostook, which includes performing 50 ophthalmic surgeries and conducting 250 to 400 patient clinical visits per week. Young Declaration ¶ 13. Dr. Young is the largest revenue producer for the Debtor. Young Declaration ¶ 16. It is not hyperbole to state that

---

[1]    A true and accurate copy of Besse's Complaint in the District Court Action is attached hereto as ***Exhibit A***.

without his efforts, both in the operating room and in overseeing day-to-day operations, the Debtor will not be able to reorganize.

19.     Continuation of the District Court Action against Dr. Young will divert Dr. Young's focus and energy away from his work and the Debtor's Chapter 11 proceedings which will, in turn, adversely impact the Debtor's ability to successfully continue its business operations and accomplish a reorganization. *See BMO Harris*, 2024 WL 914238 at *3.

20.     Second, pursuant to Section 7A.3 of the Debtor's Amended and Restated Operating Agreement dated December 28, 2012, attached hereto as **Exhibit B**, Dr. Young is entitled to seek indemnification from the Debtor for all judgments, settlements, and reasonable expensed incurred in connection with any pending action, suit or proceeding against him by reason of the fact that he is sole member of the Debtor. Therefore, by virtue of Dr. Young's right to seek indemnification from the Debtor, the interests of the Debtor and Dr. Young in the District Court Action are identical. The United States District Court for the District of Massachusetts recently determined that this was *exactly* the type of scenario warranting injunctive relief as to a non-debtor: "[o]ne such unusual circumstance is 'a suit against a party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against' the third-party." *BMO Harris,* 2024 WL 914238 at *3 (quoting *Raudonis as trustee for Water J. Raudonis 2016 Revocable Trust v. RealtyShares, Inc.,* 507 F.Supp.3d 378, 383 (D. Mass. 2020)); *see In re Philadelphia Newspapers, LLC*, 407 B.R. at 616.

21.     Besse's claim against Dr. Young is based on his personal guaranty of the Debtor's obligations to Besse. Therefore, Dr. Young cannot be liable to Besse unless the Debtor is liable to Besse. Whether the Debtor bears any liability to Besse, and if he is liable, the amount of the allowed claim of Besse, are, of course, issues that will be

resolved in this Chapter 11 case (*See* the Complaint generally and Count I). Given that fact, the interests of judicial economy favor the relief the Debtor requests herein; there is no good reason to litigate two identical cases at the same time in two different courts. *See*, *e.g.*, *Crawford v. Wolverine, Proctor & Schwartz, Inc.*, Civil Action No. 05-10078-DPW, 2006 WL 2121747 (D. Mass. July 21, 2006) (staying litigation in U.S. District Court where "[c]ertain essential elements of plaintiff's various claims against the defendants in this litigation are now before the Bankruptcy Court considering a Chapter 7 proceeding regarding the corporate defendant's successor," in light of potential for duplicative and potentially inconsistent judgments, animating concerns of automatic stay, and interests of judicial economy); *In re Celsius Nework LLC*, 642 B.R 497, 502-04 (Bankr. S.D.N.Y. 2022) (denying motion to lift automatic stay, where movant sought to continue to litigate prepetition civil action that was connected to, and would interfere with, Chapter 11 cases; "[l]ifting the stay…would lead to a duplication of efforts for both the parties and the Court and has the potential of leading to inconsistent judgments for similarly situated creditors."); *In re Chessen*, 71 B.R. 169, 171 (Bankr. D. Haw. 1987) (denying motion to lift stay where movant sought to continue to litigate prepetition civil action; to do so "would result in needless duplication of judicial resources ….").

22.     Based on the foregoing, the "unusual circumstances" warranting the extension of the automatic stay to a non-debtor are present, with respect to Dr. Young in regard to the District Court Action, because (i)  Dr. Young's and the Debtor's interests are identical in the District Court Action, and (ii) the diversion of recourses caused by continuing the District Court Action in respect to Dr. Young will adversely impact the Debtor's ability to effectuate a successful reorganization, including the specter of a potential indemnity claim by Dr. Young against the estate.

**B.     The Debtor Meets All Four Elements of the Test for Preliminary Injunctive Relief.**

23.     While the "unusual circumstances" test has been widely adopted by courts across the country to determine whether the automatic stay should be extended to non-debtors, the First Circuit has made it clear that however the relief requested is styled, it is ultimately a request for injunctive relief: "Although typically called an extension of the automatic stay to non-debtor parties, these are in fact injunctions issued by the bankruptcy court . . . ." *Slabicki,* 466 B.R. at 580 (citation omitted).

24.     As such, in addition to making a showing of "unusual circumstances" a party seeking relief of this nature must also satisfy Federal Rule of Civil Procedure 65, made applicable to bankruptcy proceedings by Fed.R.Bankr.P. 7065.[2] *E.g., Slabicki,* 466 B.R. at 581; *Philadelphia Newspapers,* 407 B.R. at 616-617. In addition, 11 U.S.C. § 105 provides the bankruptcy court with an independent statutory basis by which injunctive relief can be granted. *E.g., Slabicki,* 466 B.R. at 581; *In re Feit & Drexler, Inc.*, 760 F.2d 406, 415 (2nd Cir. 1985); 10-7065 Collier on Bankruptcy, ¶ 7065.01.

25.     Regardless of whether § 105 or Fed.R.Bankr.P. 7065 and Fed.R.Civ.P. 65 are the basis for the requested injunctive relief, the Court must nevertheless determine whether the moving party has met the requirements for injunctive relief, as established by settled jurisprudence in this Circuit.  2-105 Collier on Bankruptcy, ¶ 105.03.

26.     The First Circuit has adopted the traditional four-part test for evaluating a preliminary injunction:

> In the First Circuit, a plaintiff must satisfy four criteria in order to be entitled to a preliminary injunction. The court must find: (1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such

---

[2]     Fed.R.Civ.P. 65 applies to this adversary proceeding with one important exception. In bankruptcy cases, if a debtor, debtor-in-possession or trustee is the party seeking preliminary injunctive relief, then the moving party is excused from complying with the security requirement of Fed.R.Civ.P. 65(c). Fed.RCiv.P. 7065.

injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction.

*Planned Parenthood v. Belotti,* 614 F.2d 1006, 1009 (1st Cir. 1981); *see Waldron v. George Weston Bakeries, Inc.*, 575 F. Supp. 2d 271, 273 (D. Me. 2008); *O'Donnell v. Royal Business Group, Inc. (In re Oxford Homes, Inc.)*, 180 B.R. 1, 7 (Bankr. D.Me. 1995); 13-65 *Moore's Federal Practice – Civil*, § 65.22. While all four aspects of the test must be considered by the Court, "the *sine qua non* of [the preliminary injunction standard] is whether the plaintiffs are likely to succeed on the merits." *Weaver v. Henderson,* 984 F.2d 11, 12 (1st Cir. 1987).

27.     Here, the Debtor is able to satisfy all four parts of the test for injunctive relief and is therefore entitled to a preliminary injunction restraining Defendant from attempting to collect the amount that the Debtor purportedly owes it from Dr. Young until confirmation of a Chapter 11 plan or further order of this Court.

### The Debtor Will Suffer Irreparable Injury Absent the Requested Relief.

28.     For purposes of preliminary injunctive relief, harm is irreparable when there is no adequate legal remedy if the conduct sought to be enjoined is permitted to occur. In this Circuit and elsewhere, the absence of an adequate legal remedy, and thus irreparable harm, can be established if the conduct sought to be enjoined, if permitted to continue, would be likely to cause the ultimate failure of the business. "An injunction is proper to prevent the threatened extinction of a business . . . ." *Engine Specialties, Inc. v Bombardier Ltd.*, 454 F.2d 527, 531 (1st Cir. 1972); *Talamo v. Provincetown Bd. Of Selectmen*, 1983 U.S. Dist. LEXIS 17058, ** 5-6 (D. Mass. May 10, 1983); *In re Broadstripe, LLC,* 402 B.R. 646, 659 (Bankr. D.Del. 2009); *see Roso-Lino Beverage*

*Distribs., Inc. v. Coca-Cola Bottling Co.*, 749 F.2d 124, 126 (2nd Cir. 1984); *Semmes*

*Motors, Inc. v. Ford Motor Company, Inc.*, 429 F.2d 1197, 1205-1206 (2nd Cir. 1970).

29.    If Dr. Young is forced to litigate with Besse in the District Court,

simultaneously continuing to regularly work 60 hours per week in various locations in the

State of Maine, performing surgeries, conducting patient clinical visits, and managing

junior physicians, his ability to steer the Debtor through the Chapter 11 process, formulate

a plan of reorganization and seek confirmation of the same will inevitably be impaired. In

other words, the lack of injunctive relief "threaten[s] extinction of [the] business…."

*Engine Specialties*, 454 F.2d at 531.

30.    That the foregoing must be considered "irreparable harm" is particularly

evident in the context of a Chapter 11 reorganization.  Thus, as set forth in <u>Collier on</u>

<u>Bankruptcy</u>:

> A . . . basis for irreparable injury exists if the requested injunction seeks to
> halt actions that if unchecked would effectively reduce assets available for
> reorganization or distribution to creditors

1-105 <u>Collier on Bankruptcy</u>, ¶ 105.03

31.    While threats to the very survival of a business are sufficient grounds to

warrant injunctive relief, such threats are not necessary to establish irreparable harm.  The

lack of an adequate remedy at law can also be established if threatening conduct is likely

to result in irreparable damage to business reputation or goodwill.

32.    The deleterious effects of Dr. Young having to devote his time to litigation

in the District Court at the expense of treating patients and supervising other doctors in

his practice in their treatment of patients acutely threaten the Debtor's ability to retain

customers (patients) and protect its good will and reputation (in addition to opening the

Debtor to the likelihood of an indemnity claim by Dr. Young for, inter alia, his defense

costs).  This also warrants a finding of irreparable harm.  *Dominion Video Satellite, Inc. v.*

*Echostar Satellite Corp.*, 269 F.3d 1149, 1156-1157 (10th Cir. 2001) (findings that irreparable harm existed based on, *inter alia,* the "existence of intangible harms such as loss of goodwill or competitive market position," and that "no remedy [at law] could repair the damage to Dominion's reputation and credibility.") *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.,* 22 F.3d 546, (4th Cir. 1994) ("when the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied.') (citations omitted);

33.    The Debtor has plainly demonstrated that if Besse is not temporarily prevented from pursuing Dr. Young in the District Court while also pursuing what is effectively the same claim against the Debtor during the pendency of this Chapter 11 proceeding, the Debtor will suffer irreparable injury by the interference with the full-time attention and services of its senior physician and manager, Dr. Young, that the Chapter 11 Debtor needs to survive.  It will continue to suffer losses that will go unattended because of the litigation by Besse against its senior physician. These continuing losses are threats to the very existence of the Debtor, and adequately establish the lack of an adequate remedy at law under cases decided in this Circuit, and in many others.

### The Irreparable Injury Suffered by the Debtor Outweighs Any Harm to Besse.

34.    The "balance of harms" here swings convincingly in the Debtor's favor.

35.    In contrast to the dangers to the Debtor set forth above, the harm to Besse from a temporary stay of litigation in the District Court against Dr. Young would be minimal. First, Besse claims to be a secured creditor holding a security interest in all assets of the Debtor, including its good will. The stay of litigation against the manager and senior physician in the Debtor's practice will preserve, if not enhance the practice,

13

and at the same time the value of Besse's collateral. Moreover, Besse is not a struggling mom and pop operation that will suffer economically if its claims against Dr. Young are not immediately adjudicated. To the contrary, Besse is subsidiary of Cencora, Inc. (*f/k/a* AmerisourceBergen Corporation) that in its most recent SEC K-1 described itself as "one of the largest global pharmaceutical and sourcing and distribution service companies" and had revenue of over \$262 billion and operating income of over \$2.3 billion in its last fiscal year.[3] Besse will suffer no material harm from a delay in the litigation against Dr. Young. *See Coast to Coast,* 2024 WL 3454805 at *4 (finding the balance of harms weighed in favor a debtor which faced interference with its reorganization efforts if legal actions against its principals continued when contrasted against "the harm to the affected creditors, who are large, often multi-national enterprises, well able to withstand a delay in the pursuit of a lawsuit while the reorganization proceeds." (internal quotation omitted).

36.   There is no cognizable hardship to Besse, a purported secured creditor of the Debtor, in being restrained from litigating its claim against Dr. Young.  That claim will be preserved while the amount and validity of Besse's purported secured claim in these proceedings are adjudicated.

37.   Accordingly, the balance of harms requires injunctive relief in the form of an order enjoining Besse from pursuing its claim against Dr. Young until confirmation of a Chapter 11 plan or further order of this Court.

### *The Debtor Has Exhibited a Likelihood of Success on the Merits.*

38.   In *Purdue Pharma*, 603 U.S. --, 144 S. Ct. 2071 (2024), the Supreme Court recently ruled that bankruptcy courts cannot issue *permanent* injunctive relief in the form of a mandatory release of claims against non-debtors.

---

[3]      https://s203.q4cdn.com/785768684/files/doc_financials/2023/ar/Cencora-FY2023-10-K-Web-Posting.pdf. Last viewed July 30, 2024.

39.     The unavailability of such relief does not, however, preclude the Debtor from exhibiting a likelihood of success on the merits for purposes of <u>preliminary</u> injunctive relief. *See Parlement* and *Coast to Coast Leasing, supra.*

40.     That is, the question of likelihood of success on the merits, for purposes of the four-part test for preliminary injunctive relief, is not whether the Court ultimately could or would bar Besse's claims against Dr. Young by ordering that he be released.

41.     Rather, in this context, "'success on the merits' means the debtor's successful confirmation of a plan of reorganization." *In re Parlement*, 2024 WL 3417084 at * 3; *Coast to Coast Leasing*, 2024 WL 3454805 at *3 (citation omitted).

42.     In *Parlement*, the United States Bankruptcy Court for the District of Delaware surveyed prior cases and noted that:

> Perhaps the claims against the third party would be consensually resolved through the plan process. Perhaps the claims against the third party would proceed after the debtor emerged from bankruptcy with a confirmed plan of reorganization. The point, for present purposes, is that unlike the typical circumstance involving a preliminary injunction, these courts did not define success on the merits as the likelihood that the claim against the third party would be, at the end of the case, subject to a permanent injunction.

*In re Parlement*, 2024 WL 3417084 at * 3.  Instead, success on the merits is addressed in terms of preserving the likelihood of a successful reorganization of a Chapter 11 debtor.

43.     While, after *Purdue Pharma*, interference with a debtor's reorganization "is no longer a lawful basis for *permanently* enjoining the assertion of such a claim, it remains a sufficient basis for the entry of a *preliminary* injunction." *In re Parlement*, 2024 WL 3417084 at * 3.

> [A] preliminary injunction may still be granted if the Court concludes that (a) providing the debtor's management a breathing spell from the distraction of other litigation is necessary to permit the debtor to focus on the reorganization of its business *or* (b) because it believes the parties may ultimately be able to negotiate a plan that includes a consensual resolution of the claims against the non-debtors.

*In re Parlement*, 2024 WL 3417084 at * 1; *see Coast to Coast Leasing*, 2024 WL 3454805 at *2 (differentiating the temporary restraining order sought therein from the permanent release of claims proposed in *Purdue Pharma*).

44.     Dr. Young and the Debtor need the "breathing spell from the distraction of other litigation … to permit the debtor to focus on the reorganization of its business …." *See In re Parlement*, 2024 WL 3417084 at * 1.

45.     In addition, the Debtor intends to develop and file with the Court, in due course, a plan of reorganization that it believes will be successfully confirmed and implemented. The underlying business of the Debtor is sound; relief under Chapter 11 was necessitated by an unusual circumstance—Besse's claim for immediate payment of more than $3.0 million. The Debtor will be able to satisfy that claim, as well as its other creditor claims, utilizing revenues generated by its business, and by filing a Chapter 11 plan and seeking confirmation thereof in compliance with the provisions of the Bankruptcy Code. *See Philadelphia Newspapers, LLC*, 407 B.R. at 617 (finding the debtor, whose chapter 11 case was at "an early stage", had satisfied the reasonable likelihood of successful reorganization plan where "nothing in this case would lead [the court] to conclude the debtor does not have [a] reasonable likelihood of reorganization.")

46.     In addition, while settlement discussions have not been fruitful to date, it is entirely possible that, in the context of this bankruptcy proceeding, "the parties may ultimately be able to negotiate a plan that includes a consensual resolution of the claims against the non-debtors." *See id.*

47.     Accordingly, the Debtor has met the third prong of the preliminary injunction test, having demonstrated the likelihood of success on the merits.  In this case this is defined as the preservation of the ability of Dr. Young to serve his patients, lead his

fellow physicians, and guide the Debtor to confirmation of a plan of reorganization in this case.

### Not Only Will the Public Interest Not Be Adversely Affected By Granting the Injunction, It Will Be Advanced.

48.     The First Circuit's preliminary injunction test requires that the requested injunction not be *adverse* to the public interest.  *E.g. Waldron,* 575 F.Supp.2d at 273. Here, that standard is easily met.  The requested injunction is not merely "not adverse" to the public interest, it clearly *promotes* the public interest, in at least two important ways.

49.     First, it is undisputed that there is a strong public policy favoring orderly reorganization and settlement of debtor estates.  *E.g., In re Public Serv. Co.*, 963 F.2d 469, 471 (1st Cir. N.H. 1992); *Homestead Holdings, Inc. v. Broome & Wellington (In re PTI Holding Corp.)*, 346 B.R. 820, 832 (Bankr. D. Nev. 2006) ("The public interest in successful reorganizations is significant."); *Rehabworks, Inc. v. Lee (In re Integrated Health SerVer. St..)*, 281 B.R. 231, 239 (Bankr. D. Del. 2002); *American Film Technologies v. Taritero (In re American Film Technologies)*, 175 B.R. 847, 849 (Bankr. D. Del. 1994). Injunctions such as the one requested here are an appropriate tool to further that public policy. *E.g., Pixius Comm.,* 2005 Bankr.LEXIS 2087, *38 ("In addition, an injunction furthers the Bankruptcy Code's strong public policy of protecting debtors while they attempt to reorganize their affairs."); *Medicar Ambulance Co. v. Shalala (In re Medicar Ambulance Co.)*, 166 B.R. 918, 923 (Bankr. N.D. Cal. 1994).  Issuance of an injunction is completely consistent with the public policy favoring reorganizations for the reasons stated above, *i.e.*, avoidance of undue distraction and multiplicity of legal proceedings.

50.     Second, the Debtor and Dr. Young serve a large region in the State of Maine by providing medical, ophthalmology services to patients who live north of the

medical centers of Portland, Maine. In this region of the state, the Debtor has no medical practice competitors. Young Declaration ¶¶ 18-20.

51.     In short, the public interest will clearly be served by grant of the injunctive release sought by the Debtor—it will enable the Debtor and its lead physician to continue to provide ophthalmology services to the public in the northern region of the State of Maine.

52.     Under these circumstances, the Debtor has met the last element of this Circuit's preliminary injunction test—promotion of the public interest by granting injunctive relief.

### Basis For Expedited Relief Pursuant to D.Me. LBR 9013-4(a)(2)(B)(4)

53.     Pursuant to Local Rule 9013-4(a)(2)(B), (4), if a movant seeks to have a motion considered earlier than 21 days, no more than 48 hours after filing the motion, the motion shall list facts and circumstances justifying such an expedited determination. D. Me. LBR 9013-4(a)(2)(B), (4). Here, Dr. Young's deadline to respond to Besse's Motion for Summary Judgment in the District Court Action is due on or before August 16, 2024, which is within 21 days of this filing. Therefore, the Debtor and Dr. Young request that this Court decide this Motion on an expedited basis such that Dr. Young need not respond to Besse's motion in the District Court Action prior to the confirmation of the Debtor's plan of reorganization. As stated herein, diverging Dr. Young's focus and energy away from the Debtor's Chapter 11 proceedings will irreparably harm Debtor by threatening its ability to effectuate a successful reorganization.

### Conclusion

54.     In sum, the Debtor has demonstrated "unusual circumstances" and has satisfied all of the requirements for issuance of a preliminary injunction enjoining Besse, until confirmation of a plan of reorganization or further order of the Court, from

continuing enforcement of its claims against Dr. Young, the senior physician, and manager of the Debtor's ophthalmology practice. Granting this injunction will preserve the business of the Debtor and will serve the needs of patients of the Debtor who rely upon it—and in particular, Dr. Young—for dependable and consistent medical attention. It will not, however, adversely affect Besse in any way.

**WHEREFORE**, for all of the foregoing reasons, the Debtor respectfully requests that the Court enter its Order:

A.   Extending the automatic stay to Dr. Young and issuing a preliminary injunction enjoining and restraining Besse through confirmation of a plan of reorganization in the Debtor's Chapter 11 proceeding or further order of the Court from enforcement of its claims against the Debtor's principal, Curt T. Young; and

B.   Granting such other relief as the Court deems just and proper.

> VISION CARE OF MAINE,
> LIMITED LIABILITY COMPANY
>
> Debtor and Debtor-in-Possession

Dated: August 8, 2024

> /s/ David C. Johnson
> David C. Johnson
> George J. Marcus
> Daniel L. Rosenthal
>
> MARCUS|CLEGG
> 16 Middle Street, Suite 501
> Portland, ME 04101
> 207-828-800
> bankruptcy@marcusclegg.com
>
> Attorneys for the Debtor

19

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| ASD SPECIALTY HEALTHCARE, LLC<br>d/b/a BESSE MEDICAL, | ) <br> ) <br> ) |
| Plaintiff, | ) <br> ) |
| v. | )     Civil No. <br> ) |
| VISION CARE OF MAINE, Limited<br>Liability Company, and CURT TYLER YOUNG, | ) <br> ) <br> ) |
| Defendants. | ) |

**COMPLAINT**

Plaintiff, ASD Specialty Healthcare, LLC d/b/a Besse Medical ("ASD"), and for its Complaint against Defendants, Vision Care of Maine, Limited Liability Company and Curt Tyler Young, alleges and states as follows:

**THE PARTIES**

1.      ASD is a California limited liability company, with a place of business at 9075 Centre Pointe Drive, Suite 140, West Chester, Ohio 45069.

2.      Vision Care of Maine, Limited Liability Company ("VCM") is a Maine limited liability company with a place of business located at 1 Richmond Drive, Bangor, Maine 04401.

3.      Curt Tyler Young ("Young" and, together with VCM, the "Defendants") is an adult individual with a last known address at 1 Richmond Drive, Bangor, Maine 04401.

**JURISDICTION AND VENUE**

4.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, and there is complete diversity between ASD and the Defendants, who are citizens of different states, as follows:

1

a.      ASD's sole member is AmerisourceBergen Specialty Group, LLC, which is a Delaware limited liability company with its principal place of business in Pennsylvania.

b.      AmerisourceBergen Specialty Group, LLC's sole member is AmerisourceBergen Drug Corporation, which is a Delaware corporation with its principal place of business in Pennsylvania.

c.      Upon information and belief, VCM's members are citizens of Maine for purposes of establishing jurisdiction.

d.      Upon information and belief, Young is a citizen of Maine.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the Defendants reside in Maine and a substantial part of the events or omissions giving rise to ASD's claims against the Defendants occurred in this judicial district.

## BACKGROUND

6.      ASD is a supplier of medical and pharmaceutical products ("Pharmaceuticals").

7.      VCM is an ophthalmology practice with locations in Northern Maine.

8.      Young is the medical director and owner of VCM.

9.      On or about September 12, 2022, Young executed an application for credit on behalf of VCM (the "Credit Agreement"), pursuant to which, inter alia, VCM agreed to terms and conditions that would govern the purchase of Pharmaceuticals from ASD.  A true copy of the Credit Agreement, redacted to remove sensitive information, is attached hereto as **Exhibit "A"** and incorporated herein by reference.

10.      As an inducement to enter into the Credit Agreement, and a credit enhancement, Young executed and delivered to ASD a personal guaranty ("Guaranty") whereby Young guaranteed the payment and performance of VCM's obligations concerning the Credit Agreement.

2

A true copy of the Guaranty, redacted to remove sensitive information, is attached hereto as **Exhibit "B"** and incorporated herein by reference.

11.     Pursuant to the Credit Agreement, VCM granted ASD a purchase money security interest in inventory and a lien upon and security interest in substantially all of VCM's assets (the "Collateral").

12.     ASD perfected its lien on the Collateral by filing a UCC-1 financing statement in favor of ASD's parent, AmerisourceBergen Drug Corporation (the "UCC-1") with the Maine Secretary of State's office on January 24, 2018, as instrument number 20180124109000168.

13.     ASD's lien was extended pursuant to a continuation filed by AmerisourceBergen Drug Corporation on November 29, 2022, as instrument number 20221129109000247 (collectively, with the UCC-1, the "Financing Statement"). A true copy of the Financing Statement is attached hereto as **Exhibit "C"** and incorporated herein by reference.

14.     Pursuant to the Credit Agreement, VCM agreed to pay for the Pharmaceuticals it ordered and received from ASD within thirty (30) days from the date of invoice.

15.     Pursuant to the Credit Agreement, VCM agreed to pay late fees to ASD at the rate of 18% per annum, and to reimburse ASD for its costs of collection including, without limitation, ASD's reasonable attorneys' fees and costs.

16.     VCM purchased Pharmaceuticals from ASD through AmerisourceBergen Drug Corporation's web portal in accordance with the Credit Agreement between September 2022 and January 2023.

17.     At VCM's request, ASD shipped Pharmaceuticals to locations in Bangor and Presque Isle.

18.     VCM received invoices and statements from ASD reflecting the amounts due for Pharmaceuticals sold to VCM.

19.     Despite ordering Pharmaceuticals from ASD in connection with its business, VCM failed and/or refused to make payment for the Pharmaceuticals it purchased from ASD and, as a result, is in breach of the Credit Agreement.

20.     Likewise, Young is in default of his obligations under the Guaranty for his failure to pay ASD the sums due and owing by VCM under the Credit Agreement.

21.     As a result of the Defendants' defaults, all sums owed to ASD by VCM and Young are immediately due and payable in full, including fees and costs incurred by ASD.

22.     By letter dated March 13, 2023, ASD demanded payment of the outstanding balance from the Defendants. A true copy of the letter is attached hereto as **Exhibit "D"** and incorporated herein by reference.

23.     As of May 9, 2023, Defendants were indebted to ASD in the amount of $3,935,186.35, plus continuously accruing late fees calculated at the rate of 18% per annum on all delinquent invoices, and attorneys' fees and costs.  A true copy of an Account Statement reflecting the unpaid invoices, as of May 9, 2023, is attached hereto as **Exhibit "E"** and incorporated herein by reference.

**COUNT I**
**BREACH OF CONTRACT**
**(ASD v. VCM)**

24.     ASD incorporates herein by this reference the foregoing allegations of this Complaint as though they were set forth fully and at length.

25.     ASD had a contractual arrangement with VCM whereby ASD would accept orders

4

from and deliver Pharmaceuticals to VCM.

26.    VCM was obligated to pay for the Pharmaceuticals received from ASD, as invoiced.

27.    VCM failed to make payments to ASD in accordance with its obligations to ASD and is in default of those obligations.

28.    As a result of the foregoing defaults, $3,935,186.35 is immediately due and payable to ASD from VCM.

WHEREFORE, the plaintiff, ASD Specialty Healthcare, LLC, demands judgment against Vision Care of Maine, Limited Liability Company, in the amount of $3,935,186.35, plus interest at the rate of 18% per annum from and after March 10, 2023, attorneys' fees and costs, and such other and further relief as is just and proper as allowed by law.

### COUNT II
### UNJUST ENRICHMENT
### (In the Alternative)
### (ASD v. VCM)

29.    ASD incorporates herein by this reference the allegations set forth in paragraphs 1-10, 17, and 18 of this Complaint, as though they were set forth fully and at length.

30.    Alternatively, VCM has been unjustly enriched at ASD's expense.

31.    ASD conferred a benefit upon VCM, to which VCM was not entitled, by providing VCM with the Pharmaceuticals.

32.    Despite repeated demand, VCM has refused to return the Pharmaceuticals and/or to pay for them.

33.    By accepting delivery of the Pharmaceuticals supplied by ASD, retaining them, and not paying ASD for them, VCM has been unjustly enriched at ASD's expense, in the amount of $3,935,186.35, thereby damaging ASD.

5

WHEREFORE, the plaintiff, ASD Specialty Healthcare, LLC, demands judgment against Vision Care of Maine, Limited Liability Company, in the amount of $3,935,186.35, plus interest at the rate of 18% per annum from and after March 10, 2023, attorneys' fees and costs, and such other and further relief as is just and proper as allowed by law.

### COUNT III
### BREACH OF CONTRACT – GUARANTY
#### (ASD v. Young)

34.    ASD incorporates by this reference the allegations set forth in the preceding paragraphs as though they were set forth fully and at length.

35.    VCM failed to make payments to ASD in accordance with its obligations under the Credit Agreement and invoices issued pursuant thereto and is otherwise in default of those obligations.

36.    The Guaranty imposes, inter alia, an obligation on Young to pay all of the obligations and/or liabilities that VCM owes ASD.

37.    Young is in default and breach of his obligations under the Guaranty because of, inter alia, his failure to pay the outstanding sums due and owing by VCM to ASD under the Credit Agreement.

38.    As a result of this material breach of the Guaranty by Young, ASD has been damaged in the amount of $3,935,186.35, plus continuously accruing interest from and after May 10, 2023, at 18% per annum on each outstanding invoice, and attorneys' fees and costs which Young agreed to pay.

WHEREFORE, the plaintiff, ASD Specialty Healthcare, LLC, demands judgment against Curt Tyler Young in the amount of $3,935,186.35, plus interest at the rate of 18% per annum from

6

and after March 10, 2023, attorneys' fees and costs, and such other and further relief as is just and proper as allowed by law.

### COUNT IV
### REPLEVIN
### (ASD v. VCM)

39.     ASD incorporates by this reference the allegations set forth in the preceding paragraphs as though they were set forth fully and at length.

40.     Under the terms of the Credit Agreement, ASD became entitled to possession of the Collateral upon VCM's default.

41.     VCM has failed to deliver possession of the Collateral to ASD, including but not limited to its cash on hand, cash on deposit, and the proceeds of its accounts receivable.

WHEREFORE, the plaintiff, ASD Specialty Healthcare, LLC, demands judgment against Vision Care of Maine, Limited Liability Company, as follows:

A.  For immediate possession of the Collateral;

B.  For judgment in the amount of $3,935,186.35, plus interest from the date of each unpaid invoice, at the rate of 18% per annum on all delinquent invoices;

C.  Reasonable attorneys' fees and costs; and

D.  For such other and further relief as is this Court deems just and proper.

*[intentionally left blank]*

Dated: May 10, 2023                    Respectfully submitted,


                                       /s/ Adam R. Prescott, Esq.
                                       Adam R. Prescott, Esq. (ME Bar No. 006033)
                                       **BERNSTEIN SHUR SAWYER & NELSON, P.A.**
                                       100 Middle Street
                                       P.O. Box 9729
                                       Portland, Maine 04104-5029
                                       Tel: (207) 774-1200
                                       Fax: (207) 774-1127
                                       aprescott@bernsteinshur.com


                                       *Counsel for Plaintiff ASD Specialty Healthcare,*
                                       *LLC d/b/a Besse Medical*

# EXHIBIT A

# AmerisourceBergen

# Credit application and agreement

For expanded access to AmerisourceBergen Corporation ("AB") products and solutions

*required

| Applicant legal business name (as filed with state of formation)* | D/B/A (if applicable)* | Year business started* | Owner(s) since (mm/yyyy)* | NCPDP #* |
|---|---|---|---|---|
| Vision Care of Maine LLC | | | | |

| State of format on / incorporation* | Fax number* | Phone #* | Federal tax ID* | DNB# |
|---|---|---|---|---|
| Maine | | ▮▮▮▮ | ▮▮▮▮ | |

| Legal entity form* | Type of business | If other, please specify | Expected monthly purchases from AB |
|---|---|---|---|
| LLC (Limited Liability Co) | Retina Specialists | | $580,500 |

| Legal entity address* | City* | State* | Zip* |
|---|---|---|---|
| 1 Ridgewood Drive | Bangor | ME | 04401 |

| Billing address (if different)* | City (if different)* | State (if different)* | Zip (if different)* |
|---|---|---|---|
| | | | |

| Shipping address (if different)* | City (if different)* | State (if different)* | Zip (if different)* |
|---|---|---|---|
| | | | |

☐ **Fax opt-in.** AB sends important communications by FAX. By checking the box at the left, Applicant gives permission to AB to send documents related to order, shipment, products and promotional material, to the fax numbers provided in the Application. Applicant may opt-out of receiving fax communications at any time by emailing onboarding@amerisourcebergen.com or faxing 1.877.342.5448.

☐ **Promotions opt-in.** By checking the box at the left and signing the Application, Applicant gives permission to the AB Parties (and others on their behalf) to send texts or make calls (including those using an autodialer or artificial or prerecorded voice) regarding promotions (e.g., rebate information, deals of the day) to the phone number(s) provided in the Application. Applicant's consent is not a condition of purchase. Message and data rates may apply. Message frequency may vary. Applicant may opt-out of receiving promotional communications at any time by: (a) texting STOP from the phone number to be unsubscribed; or (b) emailing onboarding@amerisourcebergen.com with the phone number to be unsubscribed.

## Applicant's accounts payable contact information

| First name* | Last name* | Phone #* | Email* |
|---|---|---|---|
| Amanda | Thomas | ▮▮▮▮ | ▮▮▮▮ |

Will Applicant have another party (example: a parent company, subsidiary, or management company of Applicant) place orders or coordinate payment to AB on behalf of Applicant   ☐ Yes   ☑ No   If yes, please provide legal name of such party

## Ownership (list each person owning 10% or more; attach additional pages if needed)

The undersigned hereby consent(s) to and authorize(s) AB to obtain a non-business consumer credit report on the undersigned in order to further evaluate the credit worthiness of the undersigned as principal(s), proprietor(s), and/or guarantor(s) of the Applicant in connection with the extension or continuation of business credit as represented by your credit application. The undersigned as an individual(s) hereby knowingly consent(s) to the use of such credit report consistent with the Federal Fair Credit Reporting Act as contained in 15 U.S.C. §1681 et seq.

*Medical Director Owner*

| Owner's name* | Title with applicant* | % Ownership* | Owner's name* | Title with applicant* | % Ownership* |
|---|---|---|---|---|---|
| Curt Tyler young | | 100 | | | |

| Address, city, state, zip* | Social security #* | Phone #* | Address, city, state, zip* | Social security #* | Phone #* |
|---|---|---|---|---|---|
| | ▮▮▮▮ | | | | |

| Owner's signature | | | Owner's signature |
|---|---|---|---|

## Trade references

| Primary supplier* | Account #* | Phone # | Contact name |
|---|---|---|---|
| AmerisourceBergan | 0100258914 | 1-800-543-2111 | |

| Secondary supplier* | Account #* | Phone # | Contact name |
|---|---|---|---|
| AmerisourceBergan | 0100258915 | 1-800-543-2111 | |

| Bank* | Account #* | Phone # | Contact name |
|---|---|---|---|
| Camden National Bank | 15761893 | (207) 588-8146 | Debra M Brinzow |

UNI.04 2022    Credit application and agreement | Page 1 of 3

## Credit agreement

This Credit Agreement, together with the credit application submitted by Applicant, any Prime Vendor Agreement, Purchase and Sale Agreement or any similar form of distribution or supply agreement or other account application (each a "Purchase Agreement"), and stated invoice terms, constitute an agreement among (i) Applicant and (ii) AmerisourceBergen Drug Corporation ("ABDC") and ASD Specialty Healthcare, LLC doing business as ASD Healthcare (individually and collectively "ABC"), Besse Medical ("Besse") and Oncology Supply ("OS" and together with ASD and Besse, each an "ASD Party" and together with ABDC, the "ABC Parties" and individually each an "ABC Party"). Applicant understands and agrees to the following terms and conditions of sale:

1. **Payment terms.** If Applicant enters into a Purchase Agreement, the specific payment terms are as stated in such agreement or in Applicant's Payment Terms Agreement. Otherwise, specific payment terms are stated on the invoice delivered to Applicant. The following terms apply to all purchases of goods and services unless the Purchase Agreement provides otherwise, in which event the terms of the Purchase Agreement will control. (a) Applicant agrees to pay for all purchases, fees and other charges (including but not limited to any ACH draft fees) incurred by Applicant or an authorized user on any account of the Applicant. (b) All payments must be deposited to the respective ABC Party's account during normal business hours by the date due. (c) Prices quoted may include a discount in anticipation of payment within terms. Should payments be deposited to the respective ABC Party's account later than the due date or if the payment is dishonored, the respective ABC Party will invoice Applicant for the unearned discount. A processing fee of $50 will be invoiced for each dishonored payment. (d) If payment is delinquent, the respective ABC Party may, in addition to its right to exercise other remedies, (i) withhold any credits or payments to Applicant, (ii) assess a per-day late payment fee of the lower of 18% per annum or the maximum rate permitted by law on the outstanding balances until paid and/or (iii) adjust future Price of Goods or pricing on purchases of products to reflect Applicant's payment history. (e) Applicant agrees to promptly pay when invoiced all denied chargebacks for disallowed/ineligible contract pricing, and to look solely to the relevant manufacturer(s) and/or group purchasing organization(s) or buying group(s) for redress. (f) Billing disputes must be filed with the respective ABC Party's Accounts Receivable Department by the earlier of one year after receipt of the first statement containing the amount in dispute or the shorter period set by a manufacturer for chargebacks. Otherwise, Applicant will be deemed to accept the accuracy of such statements and to waive its right to dispute the amount. (g) Applicant acknowledges and understands that each ABC Party has the absolute right to change pricing or payment terms, require full or partial payment in advance or suspend delivery of products to Applicant without any liability being incurred by such ABC Party (h) Drivers and ABC Parties' employees cannot accept payment. (i) Drivers are not authorized to verify contents or quantities of packages. Applicant agrees that a receipt signed by a driver for any tote or package does not constitute evidence of the contents or value of the package. (j) Applicant may be charged an additional shipping charge applicable to orders requesting upgraded, emergency and/or same day delivery. (k) All orders of controlled substances and listed chemicals are subject to the ABC Parties' Suspicious Order Monitoring Program ("OMP"). Orders identified by the OMP may be rejected and may result in future ordering restrictions. (l) Applicant acknowledges and agrees that, as a courtesy, ABDC may bill Applicant for products sold by any ASD Party that are ordered through ABDC and delivered by an ASD Party and payment for such products shall be made on the terms set forth herein.

2. **Security agreement.** To secure all of Applicant's existing and future liabilities to the respective ABC Party and its affiliates, including the repayment of any amounts that such ABC Party may advance or spend for the maintenance or preservation of the Collateral (as defined below) or otherwise (collectively, the "Obligations"), Applicant grants to each ABC Party a lien upon and security interest in the following personal property, wherever located, and now owned or hereafter acquired or arising (collectively, the "Collateral"): all of Applicant's (a) Accounts; (b) Inventory; (c) Equipment and (d) General Intangibles and all Proceeds of the foregoing. All capitalized terms used herein and not defined have the meaning set forth in the Uniform Commercial Code as in effect in any jurisdiction in which any of the Collateral may at the time be located (the "UCC"). Applicant hereby authorizes each ABC Party to file a UCC-1 financing statement with the applicable state agency in order to perfect the security interest granted hereby and take any actions necessary to remain perfected so long as the Obligations are outstanding. Each ABC Party may at any time enforce Applicant's rights against Account Debtors and Obligors. Applicant has the risk of loss of the Collateral. Applicant will not make any sales, leases or other disposition of any of the Collateral except in the ordinary course of business. Applicant will not grant any other security interest in any of the Collateral.

3. **Covenants.** (a) Applicant certifies that any information provided in the credit application or in connection with the credit application is true and complete. (b) Applicant will provide the ABC Parties with such financial information as may be requested by the ABC Parties, and Applicant certifies that any such information will be true and complete. (c) Applicant will provide the ABC Parties at least ten (10) days prior written notice of any change in its state of formation; the location or ownership of, or any intent to sell, close or materially modify its business operations; any name change or change of business form (e.g. sole proprietorship, partnership or corporation) and any legal action that in the event of an unfavorable outcome would jeopardize the ongoing viability of Applicant. (d) Upon reasonable notice, Applicant will allow any of the ABC Parties or any other third-party engaged by an ABC Party access to Applicant's premises to inspect the Collateral and Applicant's books and records. (e) Applicant authorizes the ABC Parties and any credit agency or any service engaged by the ABC Parties to obtain, verify or otherwise investigate any information, reference, statements, credit reports or other information obtained with respect to Applicant as any ABC Party deems appropriate. (f) Applicant will maintain insurance sufficient to insure the Collateral. (g) Applicant will comply with all applicable laws and all policies of the ABC Parties, as amended from time to time, related to such laws. (h) Applicant is responsible for any applicable sales, use, gross receipts, excise, privilege, value-added, business and occupation taxes, or any other assessments or charges, regardless of how labeled, imposed by federal, state, local or foreign governments on manufacture, sales, shipment, import, export or use of products or services (other than the ABC Parties' income taxes) Applicant will provide applicable exemption certificates to the ABC Party. (i) Applicant shall be responsible for maintaining the secrecy of any login credentials or other personal information necessary for placing orders with an ABC Party and shall be solely liable for any unauthorized use of such credentials. Each ABC Party shall be entitled to rely on any communication and/or order sent or purported to be sent by Applicant or Applicant's employees, representatives or any other actor or individual purporting to be an employee, agent or representative of Applicant, irrespective of any error or fraud contained in such communication and/or order or the identity of the individual who sent the communication. (j) The obligations, representations and covenants of Applicant to the ABC Parties under this Credit Agreement will survive until all Obligations are indefeasibly paid in full.

4. **Events of default.** The occurrence of any of the following will be an Event of Default under this Credit Agreement: (a) Applicant fails to pay when due any amount owing to the respective ABC Party or its affiliates; (b) Applicant fails to comply with any of the provisions or covenants of this Credit Agreement or any other agreement now existing or hereafter entered into among Applicant and the ABC Parties or its affiliates; (c) Applicant makes any representation or warranty in this Credit Agreement, the credit application to which it is attached, any other agreement now existing or hereafter entered into between Applicant and the ABC Parties or their affiliates, or in any financial statement delivered to the ABC Parties or their affiliates that is untrue or incomplete in any aspect that an ABC Party or one of their affiliates deems to be material; (d) Applicant transfers or disposes of any of the Collateral other than in the ordinary course of business. (e) Applicant, voluntarily or involuntarily, becomes subject to any proceeding under the Bankruptcy Code or any insolvency or receivership proceeding under federal or state law; (f) Applicant fails to comply with, or becomes subject to any administrative or judicial proceeding under any federal, state or local hazardous waste or environmental law, asset forfeiture or similar law which can result in the forfeiture of property, or other law where non-compliance may have a significant, adverse effect on the Collateral or the ability of Applicant to perform its Obligations. (g) Applicant discontinues the business presently operated by it for a period of more than ten (10) consecutive days; (h) the death or incapacity of Applicant (if applicable), or any guarantor of the Obligations or the dissolution or liquidation of Applicant, (i) the sale or transfer of the business of Applicant, in whole or in part, or a "Change in Control" in Applicant, or (j) determination by an ABC Party that there has been the occurrence of a material adverse change in the business, assets, financial condition or prospects of Applicant or guarantor of the Obligations or the occurrence of an event which could reasonably be expected to result in such a material adverse change. "Change in Control" means the sale, transfer or assignment of 25% or more of Applicant's assets, the voting equity or any other voting interest in Applicant

5. **Remedies upon default.** Upon the occurrence of an Event of Default, the ABC Parties may (a) accelerate and declare all Obligations immediately due and payable without demand or notice; (b) exercise all rights and remedies of a secured party under the UCC; (c) obtain the appointment of a receiver for Applicant's business or properties, to be vested with the fullest powers permitted under applicable law, without regard to the adequacy of the Collateral for the Obligations or the solvency of Applicant and Applicant will be deemed to have consented to such appointment without the necessity of the ABC Parties to post a bond; and (d) exercise all other rights and remedies available to the ABC Parties at law or in equity. The rights and remedies provided in this Credit Agreement, or in any other agreement among the ABC Parties and Applicant or afforded by law or equity are cumulative and may be exercised concurrently, independently or successively. The ABC Parties will not be deemed to have elected or waived any other remedies by the exercise of one or more remedies. Without limiting the ABC Parties' other legal rights, the ABC Parties may exercise a right of setoff against amounts due Applicant from the ABC Parties or any of their affiliates. Any forbearance or delay in the exercise of any right or remedy hereunder or as otherwise afforded by law will not be a waiver of or preclude the exercise of any such right or remedy.

6. **Costs and expenses.** Applicant agrees to pay all reasonable attorneys' fees and expenses or costs incurred by the ABC Parties in enforcing their rights to collect amounts due from Applicant and, until paid, such fees, expenses and costs will be additional Obligations under this Credit Agreement.

7. ASD Party credits and returns. Credit for returned merchandise will be assessed upon receipt of the merchandise and only for items that are authorized for return by the applicable ASD Party. Issuance of a return authorization does not guarantee credit will be issued. All credits will be reflected in Applicant's account to apply toward future purchases. For all ASD Parties, Applicant must report any errors and/or discrepancies within 48 hours of receipt for all items. The respective ASD Party is not obligated to issue credit for errors or discrepancies not reported within such time period. Credits will be issued at the original purchase price shown on the invoice, less the amount of off-invoice allowances or adjustments, if any. Items returned due to Applicant error or overstocking are subject to a handling charge. All returns must comply with these terms and conditions and all applicable laws, rules and regulations.

8. Equal Credit Opportunity Act. The Federal Equal Credit Opportunity Act and similar state laws prohibit creditors from discriminating against credit applicant on the basis of race, color, religion, national origin, sex, sexual orientation marital status, familial status, age, because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law is the Federal Trade Commission, Equal Credit Opportunity, Washington D.C. 20580.

9. Own use. Except as provided in writing by the applicable ABC Party, Applicant hereby represents and warrants that all products purchased from the ABC Parties are intended for Applicant's "Own Use" as that term is defined by the United States Supreme Court in Abbott Labs. v. Portland Retail Druggists Assoc., 425 U.S. 1 (1976).

10. Time to assert claims, limitation on damages. Any claim against an ABC Party will be barred unless commenced within one (1) year from the date the cause of action has accrued. THE ABC PARTIES WILL NOT BE LIABLE TO APPLICANT FOR ANY LOSS OF PROFITS OR REVENUE, LOSS OF BUSINESS OPPORTUNITIES, OR INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL, EXEMPLARY, OR PUNITIVE DAMAGES OF ANY KIND WHATSOEVER.

11. Prescription Drug Marketing Act of 1987. In accordance with the requirements of the Prescription Drug Marketing Act of 1987, as amended, Applicant does hereby and will, so long as it purchases products from an ABC Party, continue to certify, represent, warrant, agree and covenant to the ABC Parties, with respect to all products to be returned to an ABC Party for credit on and after the date of this Credit Agreement that (1) all such products were purchased by Applicant from an ABC Party, (2) the credit amount claimed by Applicant and indicated on the credit memorandum and/or transmitted electronically to an ABC Party is no greater than the actual net acquisition price invoiced to or paid by Applicant for each product; (3) Applicant must provide any and all data and information, written or otherwise, requested by an ABC Party including information requested by the product manufacturer; (4) until products are received by an ABC Party such products have been properly stored, handled and shipped in accordance with all applicable laws, rules, regulations and standards, (5) Applicant must maintain documents that evidence each return of product to an ABC Party and the source from which the product was originally purchased for a period of three (3) years from the date such documents are created, and (6) Applicant has established and will maintain sufficient and appropriate business policies and processes, including periodic audits and reviews, to ensure Applicant's compliance with the foregoing certifications with respect to each product returned by Applicant to an ABC Party.

12. Governing law. This Credit Agreement and the rights and obligations of the parties will be construed, interpreted, and enforced in accordance with and governed by the internal laws or regulations, as amended, of the State of Delaware, without reference to conflict of laws principles.

13. Waiver of jury trial. THE PARTIES WAIVE ANY AND ALL RIGHTS THEY MAY HAVE TO A JURY TRIAL WITH RESPECT TO ANY CLAIM OR CAUSE OF ACTION BASED ON OR ARISING FROM THIS CREDIT AGREEMENT, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE.

14. Successors and assigns. This Credit Agreement will inure to the benefit of and be binding upon the heirs, successors and assigns or each of the parties; provided, however, Applicant may not assign this Credit Agreement without the prior written consent of the ABC Parties. Assignment of all or any part of this Credit Agreement by either party will not relieve it of responsibility of performing its obligations to the extent that they are not satisfied in full.

15. Miscellaneous. This Credit Agreement cannot be modified except by writing and signed by the party or parties to be bound. Nothing herein is intended to amend the terms of any outstanding agreement or transaction between Applicant and ABDC or ASD or in any way diminish, relinquish or terminate any of ABDC's or ASD's rights to previously provided collateral intended to secure any obligations of Applicant to either ABDC or ASD or their predecessors including, without limitation, any guaranty, letter of credit or other forms of collateral. For ABDC and ASD, to the extent there is a discrepancy between the credit terms in this Credit Agreement and the credit terms in any Purchase Agreement, the credit terms in this Credit Agreement shall control. For Besse and OS, to the extent there is a discrepancy between the terms in this Credit Agreement and the terms in any Purchase Agreement, the terms in the Purchase Agreement shall control. If any provision of this Credit Agreement is held to be invalid, illegal or unenforceable under any applicable law, such provision will be deemed severable and the remainder of this Credit Agreement will be unaffected. Captions are for convenience of reference only. This Credit Agreement may be executed in counterparts, each of which shall constitute an original, but all token together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Credit Agreement by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Credit Agreement.

16. Consent to Being Contacted. By entering into this Credit Agreement, Applicant agrees that the ABC Parties (and others on their behalf) may send texts or make calls (including those using an autodialer or artificial or prerecorded voice) regarding informational communications (e.g., related to orders, shipment, products, balances, and debts) to any phone number(s) Applicant has provided to the ABC Parties. Message and data rates may apply to such communications. Message frequency may vary. APPLICANT ACKNOWLEDGES THAT CONSENT TO RECEIVE SUCH COMMUNICATIONS IS A MATERIAL TERM OF THIS AGREEMENT AND IS GIVEN AS BARGAINED-FOR CONSIDERATION. Applicant can only revoke or modify such consent to such communications by: (a) texting STOP from the phone number to be unsubscribed; or (b) emailing onboarding@amerisourcebergen.com with the phone number to be unsubscribed. Applicant agrees that these methods for revoking such consent is reasonable and waives any right Applicant may have to use any other methods for revoking consent.

I/We have read and agree to the terms specified above, certify that all information provided is true and complete and intending to be legally bound hereby enter into this Credit Agreement on behalf of Applicant. I/We hereby authorize, by signing below, any ABC Party to order a consumer report related to the Applicant and the business principal(s) to determine credit eligibility or otherwise investigate any information, reference, statements, credit reports or other information obtained with respect to Applicant as any ABC Party deems appropriate.

Applicant legal business name
(as filed with state of formation)*

**Vision Care of Maine LLC**

Authorized signature*

Name of authorized representative*

Curt Young

Title*

Medical Director
Owner

Date*

09/12/2022

Authorized signature*

Name of authorized representative*

Title*

Date*

UNI.04.2022

# EXHIBIT B

## PERSONAL GUARANTY

Each undersigned principal of Applicant (as defined in the attached Credit Agreement), by reason of his or her financial interest in Applicant and as an inducement for AmerisourceBergen Drug Corporation ("ABDC") and/or ASD Specialty Healthcare, LLC doing business as ASD Healthcare, Besse Medical and Oncology Supply (each an "ASD Party" and together with ABDC, the "ABC Parties" and individually each an "ABC Party") to extend credit to Applicant, and intending to be legally bound, hereby jointly and severally, irrevocably and unconditionally guarantee, as sureties, to each ABC Party and its successors and assigns the prompt and full payment (and not merely the ultimate collection) and performance of all Obligations (as defined in the attached Credit Agreement) of Applicant to the ABC Parties, whether now existing or hereafter arising. Each undersigned further agrees that his or her liabilities and obligations under this guaranty will be primary, absolute and unconditional, irrespective of, and unaffected by: (a) the genuineness or enforceability of any future amendment or change in this guaranty, any agreement between one or more ABC Parties and Applicant or any other agreement to which any undersigned or Applicant is or may become a party; (b) the absence of any action to enforce this guaranty or any other document evidencing or securing the Obligations or the waiver or consent by an ABC Party with respect to any provision hereof or thereof; (c) the existence, value or condition of, or the failure to perfect an ABC Party's lien on any Collateral for the Obligations (including any Collateral under the attached Credit Agreement) or any action or failure to act by an ABC Party with respect to any such collateral; (d) the insolvency of Applicant; or (e) any other action or circumstance that might otherwise constitute a legal or equitable discharge or defense of a surety or a guarantor.

Each undersigned authorizes each ABC Party and any credit agency or other service engaged by an ABC Party to obtain and verify any reference, statement, credit report or other information about him or her that such ABC Party deems appropriate. Each undersigned waives any and all rights of subrogation, reimbursement, indemnification and contribution and any other rights and defenses that are or may be available to any undersigned, including defenses based upon statutes or rules of law providing for the marshalling of assets, changes in the principal obligation or those of another guarantor or surety and an inability to participate in, or the benefit of, any collateral for the Obligations now or hereafter held by the ABC Parties. Paragraphs 10 (Time to Assert Claims; Limitation on Damages), 12 (Governing Law) and 15 (Miscellaneous) of the Credit Agreement are hereby incorporated in this guaranty as if set forth at length and, in each case, all references in such paragraphs to the Applicant or parties will be deemed to include the undersigned and all references to the Credit Agreement will be deemed to include this guaranty.

THE PARTIES HEREBY WAIVE ANY RIGHTS THEY MAY HAVE TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED ON OR ARISING FROM THIS GUARANTY OR ANY OTHER AGREEMENT BETWEEN THE PARTIES.

| | |
|---|---|
| Guarantor's Signature | Name of Guarantor |
| Address, City, State, Zip | Phone #                                    Date    09/12/2022 |
| Spouse's Signature | Name of Spouse |
| Address, City, State, Zip | Phone #                                    Date |
| Guarantor's Signature | Name of Guarantor |
| Address, City, State, Zip | Phone #                                    Date |
| Spouse's Signature | Name of Spouse |
| Address, City, State, Zip | Phone #                                    Date |

# EXHIBIT C

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. E-MAIL CONTACT AT FILER [optional]

C. SEND ACKNOWLEDGEMENT TO: (Name and Address)

ONLINE FILING

**Maine Secretary of State**

**Filing Number:**
2018012410900000168-23

**Filing Date and Time:**
01/24/18 05:10 PM

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one debtor name (1a or 1b)(use exact, full name, do not omit, modify, or abbreviate any part of the Debtor's name); if any, part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor Information in Item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| VISION CARE OF MAINE, LIMITED LIABILITY COMPANY | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADD'L NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| 1 RIDGEWOOD DR | BANGOR | ME / 04401 | |

2. DEBTOR'S NAME: Provide only one debtor name (2a or 2b)(use exact, full name, do not omit, modify, or abbreviate any part of the Debtor's name); if any, part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor Information in Item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADD'L NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR SECURED PARTY - insert only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| ASD SPECIALTY HEALTHCARE, LLC DBA BESSE MEDICAL | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADD'L NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |
| 9075 CENTRE POINTE DRIVE, SUITE 140 | WEST CHESTER | OH / 45069-4891 | |

4. COLLATERAL: This financing statement covers the following collateral:

Customer grants to Besse Medical a purchase money security interest in inventory and a lien upon and security interest in all its personal property and any and all additions, substitutions, Accessions and Proceeds thereto or thereof, wherever located, and now owned or hereafter acquired or arising, including the following (collectively, the "Collateral"): All of Customer's (a) Accounts; (b) Inventory; (c) Chattel Paper; (d) Commercial Tort Claims as disclosed on Customer's Financial Statements; (e) Deposit Accounts; (f) Documents; (g) Equipment; (h) General Intangibles; (i) Goods; (j) Instruments; (l) Letter of Credit Rights; (m) insurance on all of the foregoing and the proceeds of that insurance; (n) Customer's money and other property of every kind and nature now or at any time or times hereafter in the possession of or under the control of Besse Medical; and (o) the Cash proceeds, Noncash proceeds and products of all of the foregoing and the Proceeds of other Proceeds. All capitalized terms used but not defined here    (Continued on next page)

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA
ME-0-62426968

**UCC Collateral continued for File Number 20180124109000168-23**

in have the meanings given to them in the Uniform Commercial Code as in effect in any jurisdiction in which any of the Collateral may at the time be located (the "UCC").

**UCC FINANCING STATEMENT AMENDMENT**
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. E-MAIL CONTACT AT FILER [optional]

C. SEND ACKNOWLEDGEMENT TO: (Name and Address)

ONLINE FILING

**Maine Secretary of State**

**Filing Number:**
20221129109000247 - 82

**Filing Date and Time:**
11/29/22 07:23 PM

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE NUMBER | 1b. | This FINANCING STATEMENT AMENDMENT is to be filed (for record) (or recorded) in the REAL ESTATE RECORDS Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in Item 13 |
|---|---|---|
| 20180124109000168 | | |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ **ASSIGNMENT (full or partial):** Provide name of Assignee in Item 7a or 7b and address of Assignee in Item 7c and name of Assignor in Item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in Item 8

4. ☒ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☐ **PARTY INFORMATION CHANGE:**

Check one of these two boxes:                          AND Check one of these three boxes to:

This Change affects ☐ Debtor or ☐ Secured Party of record    ☐ CHANGE name and/or address: Complete Item 6a or 6b; and item 7a or 7b and item 7c    ☐ ADD name: Complete Item 7a or 7b and item 7c    ☐ DELETE name: Give record name to be deleted in Item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR | | | |
| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADD'L NAME(S)/INITIAL(S) | SUFFIX |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify or abbreviate any part of the Debtor's name)

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| OR | | | |
| 7b. INDIVIDUAL'S SURNAME | | | |
| INDIVIDUAL'S FIRST PERSONAL NAME | | | |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

8. ☐ COLLATERAL CHANGE: Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:

9. NAME of SECURED PARTY of RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| ASD SPECIALTY HEALTHCARE, LLC DBA BESSE MEDICAL | | | |
| OR | | | |
| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADD'L NAME(S)/INITIAL(S) | SUFFIX |

10. OPTIONAL FILER REFERENCE DATA:
ME-0-90125555

# EXHIBIT D



## KLEHR HARRISON
## HARVEY BRANZBURG LLP

Morton R. Branzburg
Direct Dial: (215) 569-3007
Email: mbranzburg@klehr.com

March 13, 2023

**VIA FEDERAL EXPRESS**

Vision Care of Maine LLC
1 Ridgewood Drive
Bangor, ME 04401
Attn: Mr. Curt Tyler Young

Re:   **AmerisourceBergen Drug Corporation v. Vision Care of Maine LLC and Curt Tyler Young**

Dear Mr. Young:

We represent AmerisourceBergen Drug Corporation ("ABDC") in connection with the delinquent obligation of Vision Care of Maine LLC ("Vision Care"). Attached please find a statement reflecting an outstanding balance of $3,957,355.94 as of March 8, 2023. Demand is made for either immediate payment of the entire outstanding balance or an agreement, acceptable to ABDC, to pay this balance pursuant to terms, conditions and documentation acceptable to ABDC. Absent such payment or agreement, ABDC intends to institute suit against Vision Care on or after March 23, 2023.

We have reviewed the file and we recognize that discussions have taken place between ABDC and Vision Care concerning a repayment schedule. We also understand that Vision Care has not agreed to enter into an agreement, acceptable to ABDC, which would set forth terms under which this obligation would get repaid. As a result, the parties have reached an impasse, which is why this matter has been referred to us.

Reference is made to that certain Credit Application and Agreement executed by Curt Tyler Young on or about September 12, 2022 ("Credit Agreement"). Pursuant to the Credit Agreement, interest accrues on outstanding delinquent invoices for goods sold and delivered at the rate of 18% per annum. In addition, Vision Care will be responsible for fees and expenses incurred by ABDC, including attorneys' fees and costs.

Moreover, pursuant to paragraph 2 of the Credit Agreement, Vision Care granted ABDC a blanket lien and security interest in substantially all of its assets including, but not limited to all of Vision Care's Accounts, Inventory, Equipment, General Intangibles and all Proceeds of the foregoing,





March 13, 2023
Page 2

including cash proceeds ("Collateral"). Demand is hereby made to turn over all Collateral of ABDC within ten days of the date of this letter. Please contact us to arrange an orderly turnover.

Curt Tyler Young, individually guaranteed the obligations of Vision Care. Demand is hereby made on Mr. Young to satisfy the Indebtedness.

Please recognize that ABDC takes this matter very seriously and intends to exercise any and all of its rights to collect the indebtedness and protect its interests. If payment is not received or an alternative repayment plan is not entered into by March 23, 2023, ABDC intends to institute suit and take such other steps as may be necessary to protect its interests.

If you wish to discuss this matter, please contact the undersigned. You will not receive further notice before suit is instituted.

Very truly yours,

Morton R. Branzburg

MRB/jlt
cc:    Mr. Curt Tyler Young at tylercyoung@yahoo.com

PENNSYLVANIA    NEW JERSEY    DELAWARE

10395839.v1

| Account | Branch account | Branch Name | Reference | Invoice reference | Document Number | Document Type | Document Date | Net due date | Amount in local currency | Arrears after net due date | PO # |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1000021153 | 100258914 | VISION CARE OF MAINE | 3111165556 | 3111165556 | 3111165556 | RV | 11/01/2022 | 03/02/2023 | 80,896.80 | 6 | B110122BME |
| 1000021153 | 100258914 | VISION CARE OF MAINE | 3111166624 | 3111166624 | 3111166624 | RV | 11/01/2022 | 01/30/2023 | 10,447.71 | 37 | B110122BML |
| 1000021153 | 100258914 | VISION CARE OF MAINE | 3111798274 | 3111798274 | 3111798274 | RV | 11/07/2022 | 02/05/2023 | 3,887.52 | 31 | A11072022 |
| 1000021153 | 100258914 | VISION CARE OF MAINE | 3111953457 | 3111953457 | 3111953457 | RV | 11/08/2022 | 03/09/2023 | 121,345.20 | -1 | B110822E |
| 1000021153 | 100258915 | VISION CARE OF MAINE | 3111953458 | 3111953458 | 3111953458 | RV | 11/08/2022 | 02/06/2023 | 4,859.40 | 30 | B110822BML |
| 1000021153 | 100258914 | VISION CARE OF MAINE | 3112567686 | 3112567686 | 3112567686 | RV | 11/14/2022 | 03/15/2023 | 80,896.80 | -7 | A11142022 |
| 1000021153 | 100258914 | VISION CARE OF MAINE | 3112736197 | 3112736197 | 3112736197 | RV | 11/15/2022 | 03/16/2023 | 161,793.60 | -8 | B111522BME |
| 1000021153 | 100258915 | VISION CARE OF MAINE | 3113382571 | 3113382571 | 3113382571 | RV | 11/21/2022 | 03/22/2023 | 80,896.80 | -14 | A11212022 |
| 1000021153 | 100258915 | VISION CARE OF MAINE | 3113382572 | 3113382572 | 3113382572 | RV | 11/21/2022 | 02/19/2023 | 4,859.40 | 17 | A11212022 |
| 1000021153 | 100258915 | VISION CARE OF MAINE | 3113392685 | 3113392685 | 3113392685 | RV | 11/21/2022 | 02/19/2023 | 3,644.55 | 17 | B1121332BML |
| 1000021153 | 100258915 | VISION CARE OF MAINE | 3113392686 | 3113392686 | 3113392686 | RV | 11/21/2022 | 03/22/2023 | 161,793.60 | -14 | B112122BME |
| 1000021153 | 100258914 | VISION CARE OF MAINE | 3113841809 | 3113841809 | 3113841809 | RV | 11/27/2022 | 02/25/2023 | 7,289.10 | 11 | B112522BML |
| 1000021153 | 100258914 | VISION CARE OF MAINE | 3113842100 | 3113842100 | 3113842100 | RV | 11/27/2022 | 03/28/2023 | 80,896.80 | -20 | B112522BME |
| 1000021153 | 100258915 | VISION CARE OF MAINE | 3114178143 | 3114178143 | 3114178143 | RV | 11/28/2022 | 03/30/2023 | 67,414.00 | -22 | A11292022 |
| 1000021153 | 100258915 | VISION CARE OF MAINE | 3114179080 | 3114179080 | 3114179080 | RV | 11/29/2022 | 03/30/2023 | 121,345.20 | -22 | B112922BME |
| 1000021153 | 100258914 | VISION CARE OF MAINE | 3114903442 | 3114903442 | 3114903442 | RV | 12/05/2022 | 04/05/2023 | 161,793.60 | -28 | B120522BML |
| 1000021153 | 100258915 | VISION CARE OF MAINE | 3114903443 | 3114903443 | 3114903443 | RV | 12/05/2022 | 03/05/2023 | 3,887.52 | 3 | B120522BML |
| 1000021153 | 100258914 | VISION CARE OF MAINE | 3114946246 | 3114946246 | 3114946246 | RV | 12/05/2022 | 04/05/2023 | 40,448.40 | -28 | A12052022 |
| 1000021153 | 100258915 | VISION CARE OF MAINE | 3114946247 | 3114946247 | 3114946247 | RV | 12/05/2022 | 03/05/2023 | 5,102.37 | 3 | A12052022 |
| 1000021153 | 100258914 | VISION CARE OF MAINE | 3115098353 | 3115098353 | 3115098353 | RV | 12/06/2022 | 04/06/2023 | 161,793.60 | -29 | B120622BME |
| 1000021153 | 100258915 | VISION CARE OF MAINE | 3115624052 | 3115624052 | 3115624052 | RV | 12/12/2022 | 04/12/2023 | 121,345.20 | -35 | B120522BME |
| 1000021153 | 100258914 | VISION CARE OF MAINE | 3115797084 | 3115797084 | 3115797084 | RV | 12/12/2022 | 04/12/2023 | 121,345.20 | -35 | A12122022 |
| 1000021153 | 100258915 | VISION CARE OF MAINE | 3115797085 | 3115797085 | 3115797085 | RV | 12/12/2022 | 03/12/2023 | 6,317.22 | -4 | A12122022 |
| 1000021153 | 100258915 | VISION CARE OF MAINE | 3115961436 | 3115961436 | 3115961436 | RV | 12/13/2022 | 04/13/2023 | 161,793.60 | -36 | B121322BME |
| 1000021153 | 100258914 | VISION CARE OF MAINE | 3115961437 | 3115961437 | 3115961437 | RV | 12/13/2022 | 03/13/2023 | 10,204.74 | -5 | B121322BML |
| 1000021153 | 100258914 | VISION CARE OF MAINE | 3116542631 | 3116542631 | 3116542631 | RV | 12/19/2022 | 04/18/2023 | 42,924.00 | -41 | B121722BMV |
| 1000021153 | 100258914 | VISION CARE OF MAINE | 3116542632 | 3116542632 | 3116542632 | RV | 12/19/2022 | 04/19/2023 | 161,793.60 | -42 | A12192022 |
| 1000021153 | 100258915 | VISION CARE OF MAINE | 3116723251 | 3116723251 | 3116723251 | RV | 12/19/2022 | 04/19/2023 | 121,345.20 | -42 | A12192022 |
| 1000021153 | 100258915 | VISION CARE OF MAINE | 3116879760 | 3116879760 | 3116879760 | RV | 12/20/2022 | 04/20/2023 | 121,345.20 | -43 | B220228ME |
| 1000021153 | 100258915 | VISION CARE OF MAINE | 3116879761 | 3116879761 | 3116879761 | RV | 12/20/2022 | 03/20/2023 | 6,074.25 | -12 | B122022BML |
| 1000021153 | 100258914 | VISION CARE OF MAINE | 3117572794 | 3117572794 | 3117572794 | RV | 12/27/2022 | 04/27/2023 | 80,896.80 | -50 | A12272022 |
| 1000021153 | 100258915 | VISION CARE OF MAINE | 3117572795 | 3117572795 | 3117572795 | RV | 12/27/2022 | 03/27/2023 | 3,887.52 | -19 | A12272022 |
| 1000021153 | 100258914 | VISION CARE OF MAINE | 3117606184 | 3117606184 | 3117606184 | RV | 12/27/2022 | 04/27/2023 | 161,793.60 | -50 | B122722BME |
| 1000021153 | 100258914 | VISION CARE OF MAINE | 3177743957 | 3177743957 | 3177743957 | RV | 12/28/2022 | 03/26/2023 | 7,775.04 | 20 | 2022026241 |
| 1000021153 | 100258914 | VISION CARE OF MAINE | 3105268471 | 3105268471 | 3105268471 | RV | 09/07/2022 | 01/06/2023 | 98,823.30 | 61 | A09072022 |
| 1000021153 | 100258915 | VISION CARE OF MAINE | 3105734222 | 3105734222 | 3105734222 | RV | 09/12/2022 | 01/11/2023 | 68,154.00 | 56 | A09122022 |
| 1000021153 | 100258914 | VISION CARE OF MAINE | 3105886398 | 3105886398 | 3105886398 | RV | 09/13/2022 | 01/12/2023 | 122,677.20 | 55 | B0913223BME |
| 1000021153 | 100258914 | VISION CARE OF MAINE | 3105887220 | 3105887220 | 3105887220 | RV | 09/13/2022 | 01/11/2023 | 42,924.00 | 56 | B091322BMV |
| 1000021153 | 100258914 | VISION CARE OF MAINE | 3106498884 | 3106498884 | 3106498884 | RV | 09/19/2022 | 01/18/2023 | 81,784.80 | 49 | A09162022 |
| 1000021153 | 100258915 | VISION CARE OF MAINE | 3106650293 | 3106650293 | 3106650293 | RV | 09/20/2022 | 01/19/2023 | 163,569.60 | 48 | B092022BME |
| 1000021153 | 100258914 | VISION CARE OF MAINE | 3107263006 | 3107263006 | 3107263006 | RV | 09/26/2022 | 01/25/2023 | 20,446.20 | 42 | A09262022 |
| 1000021153 | 100258915 | VISION CARE OF MAINE | 3107399017 | 3107399017 | 3107399017 | RV | 09/28/2022 | 01/28/2023 | 163,569.60 | 41 | B092722BME |
| 1000021153 | 100258914 | VISION CARE OF MAINE | | 3105109984 | 604707540 | DA | 01/06/2023 | 01/05/2023 | 116,546.60 | 62 | B0900222BME |
| 1000021153 | 100258915 | VISION CARE OF MAINE | | 3111798273 | 604839098 | DA | 03/06/2023 | 03/08/2023 | 55,425.58 | 0 | A11072022 |
| 1000021153 | 100258914 | VISION CARE OF MAINE | | 803828232 | 803828232 | YL | 12/30/2022 | 01/29/2023 | 80.66 | 38 | late fee |
| 1000021153 | 100258915 | VISION CARE OF MAINE | | 803830869 | 803830869 | YL | 01/06/2022 | 02/05/2022 | 489.53 | 31 | late fee |
| 1000021153 | 100258914 | VISION CARE OF MAINE | | 803856734 | 803856734 | YL | 01/13/2023 | 02/12/2023 | 506.97 | 24 | late fee |
| 1000021153 | 100258914 | VISION CARE OF MAINE | | 803861170 | 803861170 | YL | 02/03/2023 | 03/05/2023 | 2,183.75 | 3 | late fee |
| 1000021153 | 100258915 | VISION CARE OF MAINE | | 803861171 | 803861171 | YL | 02/03/2023 | 03/05/2023 | 974.00 | 3 | late fee |
| 1000021153 | 100258914 | VISION CARE OF MAINE | | 803865033 | 803865033 | YL | 02/10/2023 | 03/12/2023 | 2,587.80 | -4 | late fee |
| 1000021153 | 100258915 | VISION CARE OF MAINE | | 803865034 | 803865034 | YL | 02/10/2023 | 03/12/2023 | 1,085.01 | -4 | late fee |
| 1000021153 | 100258915 | VISION CARE OF MAINE | | 803870690 | 803870690 | YL | 01/20/2023 | 02/19/2023 | 1,054.66 | 17 | late fee |
| 1000021153 | 100258914 | VISION CARE OF MAINE | | 803870691 | 803870691 | YL | 01/20/2023 | 02/19/2023 | 657.07 | 17 | late fee |
| 1000021153 | 100258914 | VISION CARE OF MAINE | | 803882369 | 803882369 | YL | 01/27/2023 | 02/26/2023 | 1,619.31 | 10 | late fee |
| 1000021153 | 100258915 | VISION CARE OF MAINE | | 803882370 | 803882370 | YL | 01/27/2023 | 02/26/2023 | 891.13 | 10 | late fee |
| 1000021153 | 100258914 | VISION CARE OF MAINE | | 803906704 | 803906704 | YL | 02/17/2023 | 03/19/2023 | 2,717.66 | -11 | late fee |
| 1000021153 | 100258915 | VISION CARE OF MAINE | | 803906705 | 803906705 | YL | 02/17/2023 | 03/19/2023 | 1,090.76 | -11 | late fee |
| 1000021153 | 100258914 | VISION CARE OF MAINE | | 803910048 | 803910048 | YL | 02/24/2023 | 03/26/2023 | 2,779.89 | -18 | late fee |
| 1000021153 | 100258915 | VISION CARE OF MAINE | | 803910049 | 803910049 | YL | 02/24/2023 | 03/26/2023 | 1,194.38 | -18 | late fee |
| 1000021153 | 100258914 | VISION CARE OF MAINE | | 803927121 | 803927121 | YL | 03/03/2023 | 04/02/2023 | 3,200.40 | -25 | late fee |
| 1000021153 | 100258915 | VISION CARE OF MAINE | | 803927122 | 803927122 | YL | 03/03/2023 | 04/02/2023 | 1,524.76 | -25 | late fee |
| 1000021153 | 100258914 | VISION CARE OF MAINE | 3107993602 | 3107993602 | 3107993602 | RV | 10/03/2022 | 02/01/2023 | 40,448.40 | 35 | A10032022 |
| 1000021153 | 100258915 | VISION CARE OF MAINE | 3108130114 | 3108130114 | 3108130114 | RV | 10/04/2022 | 02/02/2023 | 121,345.20 | 34 | B100422BME |
| 1000021153 | 100258915 | VISION CARE OF MAINE | 3108883517 | 3108883517 | 3108883517 | RV | 10/10/2022 | 02/09/2023 | 40,448.40 | 27 | B101122BME |
| 1000021153 | 100258915 | VISION CARE OF MAINE | 3110325681 | 3110325681 | 3110325681 | RV | 10/24/2022 | 02/22/2023 | 97,750.30 | 14 | A10242022 |
| 1000021153 | 100258914 | VISION CARE OF MAINE | 3110406635 | 3110406635 | 3110406635 | RV | 10/25/2022 | 02/23/2023 | 121,345.20 | 13 | B102522BME |
| 1000021153 | 100258915 | VISION CARE OF MAINE | 3111027244 | 3111027244 | 3111027244 | RV | 10/31/2022 | 03/01/2023 | 80,896.80 | 7 | A10312022 |
| 1000021153 | 100258915 | VISION CARE OF MAINE | 3111027245 | 3111027245 | 3111027245 | RV | 10/31/2022 | 02/19/2023 | 2,429.70 | 38 | A10312022 |
| | | | | | | | | | 3,957,355.94 | | |

# EXHIBIT E

| Account | Branch account | Branch Name | Reference | Invoice reference | Document Number | Document Type | Document Date | Net due date | Amount in local currency | Arrears after net due date | PO # |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 100021153 | 100258914 | VISION CARE OF MAINE | 3111165556 | 3111165556 | 3111165556 | RV | 11/1/2022 | 3/2/2023 | 80,896.80 | 6 | B110122BME |
| 100021153 | 100258915 | VISION CARE OF MAINE | 3111166624 | 3111166624 | 3111166624 | RV | 11/1/2022 | 1/30/2023 | 10,447.71 | 37 | B110122BML |
| 100021153 | 100258915 | VISION CARE OF MAINE | 3111798274 | 3111798274 | 3111798274 | RV | 11/7/2022 | 2/5/2023 | 3,887.52 | 31 | A11072022 |
| 100021153 | 100258914 | VISION CARE OF MAINE | 3111953457 | 3111953457 | 3111953457 | RV | 11/8/2022 | 3/9/2023 | 121,345.20 | -1 | B110822E |
| 100021153 | 100258914 | VISION CARE OF MAINE | 3111953458 | 3111953458 | 3111953458 | RV | 11/8/2022 | 2/6/2023 | 4,859.40 | 30 | B110822BML |
| 100021153 | 100258915 | VISION CARE OF MAINE | 3112587686 | 3112587686 | 3112587686 | RV | 11/14/2022 | 3/15/2023 | 80,896.80 | -7 | A11142022 |
| 100021153 | 100258914 | VISION CARE OF MAINE | 3112736197 | 3112736197 | 3112736197 | RV | 11/15/2022 | 3/16/2023 | 161,793.60 | -8 | B111522BME |
| 100021153 | 100258914 | VISION CARE OF MAINE | 3113382571 | 3113382571 | 3113382571 | RV | 11/21/2022 | 3/22/2023 | 80,896.80 | -14 | A11212022 |
| 100021153 | 100258915 | VISION CARE OF MAINE | 3113382572 | 3113382572 | 3113382572 | RV | 11/21/2022 | 2/19/2023 | 4,859.40 | 17 | A11212022 |
| 100021153 | 100258914 | VISION CARE OF MAINE | 3113392685 | 3113392685 | 3113392685 | RV | 11/21/2022 | 2/19/2023 | 3,644.55 | 17 | B1121232BML |
| 100021153 | 100258914 | VISION CARE OF MAINE | 3113392686 | 3113392686 | 3113392686 | RV | 11/21/2022 | 3/22/2023 | 161,793.60 | -14 | B112122BME |
| 100021153 | 100258915 | VISION CARE OF MAINE | 3113841809 | 3113841809 | 3113841809 | RV | 11/27/2022 | 2/25/2023 | 7,289.10 | 11 | B112522BML |
| 100021153 | 100258914 | VISION CARE OF MAINE | 3113842100 | 3113842100 | 3113842100 | RV | 11/27/2022 | 3/28/2023 | 80,896.80 | -20 | B112522BME |
| 100021153 | 100258915 | VISION CARE OF MAINE | 3114178143 | 3114178143 | 3114178143 | RV | 11/29/2022 | 3/30/2023 | 67,414.00 | -22 | A11292022 |
| 100021153 | 100258914 | VISION CARE OF MAINE | 3114179060 | 3114179060 | 3114179060 | RV | 11/29/2022 | 3/30/2023 | 121,345.20 | -22 | B112922BME |
| 100021153 | 100258914 | VISION CARE OF MAINE | 3114903442 | 3114903442 | 3114903442 | RV | 12/5/2022 | 4/5/2023 | 161,793.60 | -28 | B120522BME |
| 100021153 | 100258915 | VISION CARE OF MAINE | 3114903443 | 3114903443 | 3114903443 | RV | 12/5/2022 | 2/19/2023 | 3,887.52 | 3 | B120522BML |
| 100021153 | 100258915 | VISION CARE OF MAINE | 3114946246 | 3114946246 | 3114946246 | RV | 12/5/2022 | 4/5/2023 | 40,448.40 | -28 | A12052022 |
| 100021153 | 100258914 | VISION CARE OF MAINE | 3114946247 | 3114946247 | 3114946247 | RV | 12/5/2022 | 3/5/2023 | 5,102.37 | 3 | A12052022 |
| 100021153 | 100258914 | VISION CARE OF MAINE | 3115098353 | 3115098353 | 3115098353 | RV | 12/6/2022 | 4/6/2023 | 161,793.60 | -29 | B120622BME |
| 100021153 | 100258915 | VISION CARE OF MAINE | 3115624052 | 3115624052 | 3115624052 | RV | 12/12/2022 | 4/12/2023 | 121,345.20 | -35 | B120922BME |
| 100021153 | 100258915 | VISION CARE OF MAINE | 3115797084 | 3115797084 | 3115797084 | RV | 12/12/2022 | 4/12/2023 | 121,345.20 | -35 | A12122022 |
| 100021153 | 100258914 | VISION CARE OF MAINE | 3115797085 | 3115797085 | 3115797085 | RV | 12/12/2022 | 3/12/2023 | 6,317.22 | -4 | A12122022 |
| 100021153 | 100258914 | VISION CARE OF MAINE | 3115961436 | 3115961436 | 3115961436 | RV | 12/13/2022 | 4/13/2023 | 161,793.60 | -36 | B13132BME |
| 100021153 | 100258915 | VISION CARE OF MAINE | 3115961437 | 3115961437 | 3115961437 | RV | 12/13/2022 | 3/13/2023 | 10,204.74 | -5 | B13132BML |
| 100021153 | 100258914 | VISION CARE OF MAINE | 3116542631 | 3116542631 | 3116542631 | RV | 12/19/2022 | 4/18/2023 | 42,924.00 | -41 | B121722BMV |
| 100021153 | 100258915 | VISION CARE OF MAINE | 3116542632 | 3116542632 | 3116542632 | RV | 12/19/2022 | 4/19/2023 | 161,793.60 | -42 | B121722BME |
| 100021153 | 100258915 | VISION CARE OF MAINE | 3116723251 | 3116723251 | 3116723251 | RV | 12/19/2022 | 4/19/2023 | 121,345.20 | -42 | A12192022 |
| 100021153 | 100258914 | VISION CARE OF MAINE | 3116879760 | 3116879760 | 3116879760 | RV | 12/20/2022 | 4/20/2023 | 121,345.20 | -43 | B22022BME |
| 100021153 | 100258915 | VISION CARE OF MAINE | 3116879761 | 3116879761 | 3116879761 | RV | 12/20/2022 | 3/20/2023 | 6,074.25 | -12 | B122022BML |
| 100021153 | 100258915 | VISION CARE OF MAINE | 3117572794 | 3117572794 | 3117572794 | RV | 12/27/2022 | 4/27/2023 | 80,896.80 | -50 | A12272022 |
| 100021153 | 100258914 | VISION CARE OF MAINE | 3117572795 | 3117572795 | 3117572795 | RV | 12/27/2022 | 3/27/2023 | 3,887.52 | -19 | A12272022 |
| 100021153 | 100258914 | VISION CARE OF MAINE | 3117606184 | 3117606184 | 3117606184 | RV | 12/27/2022 | 4/27/2023 | 161,793.60 | -50 | B122772022 |
| 100021153 | 100258914 | VISION CARE OF MAINE | 3117743957 | 3117743957 | 3117743957 | RV | 12/28/2022 | 3/28/2023 | 7,775.04 | -20 | 202206241 |
| 100021153 | 100258915 | VISION CARE OF MAINE | 3105268471 | 3105268471 | 3105268471 | RV | 9/7/2022 | 1/6/2023 | 98,823.30 | 61 | A09072022 |
| 100021153 | 100258915 | VISION CARE OF MAINE | 3105734222 | 3105734222 | 3105734222 | RV | 9/12/2022 | 1/11/2023 | 68,154.00 | 56 | A09122022 |
| 100021153 | 100258914 | VISION CARE OF MAINE | 3105886398 | 3105886398 | 3105886398 | RV | 9/13/2022 | 1/12/2023 | 122,677.20 | 55 | B091322BME |
| 100021153 | 100258915 | VISION CARE OF MAINE | 3105887220 | 3105887220 | 3105887220 | RV | 9/13/2022 | 1/11/2023 | 42,924.00 | 56 | B091322BMV |
| 100021153 | 100258914 | VISION CARE OF MAINE | 3106498884 | 3106498884 | 3106498884 | RV | 9/19/2022 | 1/18/2023 | 81,784.80 | 49 | A09192022 |
| 100021153 | 100258914 | VISION CARE OF MAINE | 3106650293 | 3106650293 | 3106650293 | RV | 9/20/2022 | 1/19/2023 | 163,569.60 | 48 | B092022BME |
| 100021153 | 100258915 | VISION CARE OF MAINE | 3107263006 | 3107263006 | 3107263006 | RV | 9/26/2022 | 1/25/2023 | 20,446.20 | 42 | A09272022 |
| 100021153 | 100258914 | VISION CARE OF MAINE | 3107399017 | 3107399017 | 3107399017 | RV | 9/27/2022 | 1/26/2023 | 163,569.60 | 41 | B092722BME |

| Acct | Sub-Acct | Name | Invoice No. 1 | Invoice No. 2 | Invoice No. 3 | Init | Date 1 | Date 2 | Amount | Days | Reference |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 100021153 | 100258914 | VISION CARE OF MAINE | 3105109964 | | 604707540 | DA | 1/6/2023 | 1/5/2023 | 116,546.80 | 62 | B090622BME |
| 100021153 | 100258915 | VISION CARE OF MAINE | 3111798273 | | 604839098 | DA | 3/6/2023 | 3/8/2023 | 55,425.58 | 0 | A11072022 |
| 100021153 | 100258914 | VISION CARE OF MAINE | 803828232 | 803828232 | | YL | 12/30/2022 | 1/29/2023 | 80.66 | 38 | late fee |
| 100021153 | 100258914 | VISION CARE OF MAINE | 803830869 | 803830869 | | YL | 1/6/2023 | 2/5/2023 | 489.53 | 31 | late fee |
| 100021153 | 100258914 | VISION CARE OF MAINE | 803856734 | 803856734 | | YL | 1/13/2023 | 2/12/2023 | 506.97 | 24 | late fee |
| 100021153 | 100258914 | VISION CARE OF MAINE | 803861170 | 803861170 | | YL | 2/3/2023 | 3/5/2023 | 2,183.75 | 3 | late fee |
| 100021153 | 100258915 | VISION CARE OF MAINE | 803861171 | 803861171 | | YL | 2/3/2023 | 3/5/2023 | 974.00 | 3 | late fee |
| 100021153 | 100258914 | VISION CARE OF MAINE | 803865033 | 803865033 | | YL | 2/10/2023 | 3/12/2023 | 2,587.80 | -4 | late fee |
| 100021153 | 100258914 | VISION CARE OF MAINE | 803865034 | 803865034 | | YL | 2/10/2023 | 3/12/2023 | 1,085.01 | -4 | late fee |
| 100021153 | 100258914 | VISION CARE OF MAINE | 803870690 | 803870690 | | YL | 1/20/2023 | 2/19/2023 | 1,054.66 | 17 | late fee |
| 100021153 | 100258915 | VISION CARE OF MAINE | 803870691 | 803870691 | | YL | 1/20/2023 | 2/19/2023 | 657.07 | 17 | late fee |
| 100021153 | 100258914 | VISION CARE OF MAINE | 803882369 | 803882369 | | YL | 1/27/2023 | 2/26/2023 | 1,619.31 | 10 | late fee |
| 100021153 | 100258915 | VISION CARE OF MAINE | 803882370 | 803882370 | | YL | 1/27/2023 | 2/26/2023 | 891.13 | 10 | late fee |
| 100021153 | 100258914 | VISION CARE OF MAINE | 803906704 | 803906704 | | YL | 2/17/2023 | 3/19/2023 | 2,717.66 | -11 | late fee |
| 100021153 | 100258915 | VISION CARE OF MAINE | 803906705 | 803906705 | | YL | 2/17/2023 | 3/19/2023 | 1,090.76 | -11 | late fee |
| 100021153 | 100258914 | VISION CARE OF MAINE | 803910048 | 803910048 | | YL | 2/24/2023 | 3/26/2023 | 2,779.89 | -18 | late fee |
| 100021153 | 100258915 | VISION CARE OF MAINE | 803910049 | 803910049 | | YL | 2/24/2023 | 3/26/2023 | 1,194.36 | -18 | late fee |
| 100021153 | 100258914 | VISION CARE OF MAINE | 803927121 | 803927121 | | YL | 3/3/2023 | 4/2/2023 | 3,200.40 | -25 | late fee |
| 100021153 | 100258915 | VISION CARE OF MAINE | 803927122 | 803927122 | | YL | 3/3/2023 | 4/2/2023 | 1,524.76 | -25 | late fee |
| 100021153 | 100258915 | VISION CARE OF MAINE | 3107993602 | 3107993602 | 3107993602 | RV | 10/3/2022 | 2/1/2023 | 40,448.40 | 35 | A10032022 |
| 100021153 | 100258915 | VISION CARE OF MAINE | 3108130114 | 3108130114 | 3108130114 | RV | 10/4/2022 | 2/2/2023 | 121,345.20 | 34 | B100422BME |
| 100021153 | 100258914 | VISION CARE OF MAINE | 3108883517 | 3108883517 | 3108883517 | RV | 10/11/2022 | 2/9/2023 | 40,448.40 | 27 | B101122BME |
| 100021153 | 100258915 | VISION CARE OF MAINE | 3110325881 | 3110325881 | 3110325881 | RV | 10/24/2022 | 2/22/2023 | 97,750.30 | 14 | A10242022 |
| 100021153 | 100258914 | VISION CARE OF MAINE | 3110404635 | 3110404635 | 3110404635 | RV | 10/25/2022 | 2/23/2023 | 121,345.20 | 13 | B1025223BME |
| 100021153 | 100258915 | VISION CARE OF MAINE | 3111027244 | 3111027244 | 3111027244 | RV | 10/31/2022 | 3/1/2023 | 80,896.80 | 7 | A10312022 |
| 100021153 | 100258915 | VISION CARE OF MAINE | 3111027245 | 3111027245 | 3111027245 | RV | 10/31/2022 | 1/29/2023 | 2,429.70 | 38 | A10312022 |

**3,957,355.94**

AMENDED AND RESTATED OPERATING AGREEMENT
OF
VISION CARE OF MAINE, LIMITED LIABILITY COMPANY


This instrument is made and entered into as of this 28th day of December, 2012, by Craig W. Young, an individual with a principal place of business at 1 Ridgewood Drive, Bangor, Maine (hereinafter referred to as "C. Young"), and upon their execution of a joinder with respect to this instrument, by Bradley P. Young, Curt Young and Marcia Young, all individuals.

### WITNESSETH:

WHEREAS, On June 23, 1995, C. Young caused the formation of Vision Care of Maine, Limited Liability Company (the "Company") as a limited liability company pursuant to the provisions Maine law, to wit, 31 M.R.S.A. Sec. 622 and the Maine Limited Liability Company Act, as the same may be in effect from time to time (the "Act"), to be managed by one or more managers; and

WHEREAS, On June 23, 1995, C. Young made and entered into an operating Agreement for the Company (the "Operating Agreement"); and

WHEREAS, C. Young, is the sole member and manager of the Company and in such capacities, and by this instrument, wishes to amend the Operating Agreement in accordance with the terms of this instrument, and by this amendment to withdraw as a member and to transfer all of his Membership Interests to Marcia Young, Bradley P. Young, and Curt Young as new Members.;

NOW, THEREFORE, C. Young, as sole member and manager of the Company hereby adopts the following Amended and Restated Operating Agreement for the Company

### DEFINITIONS:

As used in this Agreement, the following terms shall have the following meanings:

"Act" means the Maine Limited Liability Company Act, Sections 1601 *et seq.* and any successor statute, as amended from time to time.

"Affiliate" of, or a Person "Affiliated" with, a specified Person means a Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the Person specified, where control means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, contract or otherwise.

1

"Agreement" means this Limited Liability Company Agreement, as executed and as it may be amended, modified, supplemented or restated from time to time in accordance herewith.

"Change of Control" means (a) a merger, consolidation, or issuance or sale of the Company's securities, in which securities possessing more than fifty percent (50%) of the total combined voting power of the Company's (or any successor's) outstanding securities are transferred to a person or persons different from the persons holding such securities immediately prior to such transaction; or (b) the sale, transfer or other disposition of all or substantially all of the Company's (or any successor's) assets to a party other than a Subsidiary of the Company; provided that, a "Change of Control" shall not include any sale, transfer or other disposition of assets or a merger, consolidation or issuance or sale of securities provided in Article X.

"Distribution" means each distribution made by the Company to a Member, whether in cash, property or securities of the Company and whether by liquidating distribution, redemption, repurchase or otherwise; provided that, none of the following shall be a Distribution: any recapitalization or exchange of securities of the Company, and any subdivision (by unit split or otherwise) or any combination (by reverse unit split or otherwise) of any outstanding Units.

"Manager" means one or more of the Mangers of the Company  References to Manager in the singular or as him, her, it, itself or other like references shall also, where the context so requires, be deemed to include the plural or the masculine or feminine reference, as the case may be.

"Member" means the Members listed on Schedule A hereto and each Person who is hereafter admitted as a Member in accordance with the terms of this Agreement and the Act, in each case so long as such Person is shown on the Company's books and records as the owner of one or more Units.  The Members shall constitute the "members" (as that term is defined in the Act) of the Company.  Reference to a "Member" means any one of the Members.

"Membership Interest" means a Member's interest in the Company, including such Member's economic interest and right, if any, to participate in the management of the business and affairs of the Company, including the right, if any, to vote on, consent to or otherwise participate in any decision or action of or by the Members and the right to receive information concerning the business and affairs of the Company, in each case to the extent expressly provided in this Agreement or otherwise required by the Act.

"Officer" means each person designated as an officer of the Company by the Managers.

"Person" means a natural person, partnership (whether general or limited), limited liability company, trust, estate, association, corporation, custodian, nominee or any other individual or entity in its own or any representative capacity.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (ii) if a limited liability company, partnership, association or other business entity, a majority of the membership, partnership, or other similar, ownership interest thereof is at the time owned or controlled, directly or indirectly, by any Person or one or more Subsidiaries of that Person or a combination thereof. For purposes hereof, a Person or Persons shall be deemed to have a majority ownership interest in a limited liability company, partnership, association or other business entity if such Person or Persons shall be allocated a majority of limited liability company, partnership, association or other business entity gains or losses or shall be or control any managing director, managing member, or general partner of such limited liability company, partnership, association or other business entity, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person, whether through the ownership of voting securities, contract or otherwise.

"Tax Distribution" means, with respect to a Member, any Distribution made with respect to such Membership Interest and accompanying Units pursuant to this Agreement.

"Transfer" means a sale, assignment, transfer, exchange, mortgage, pledge, grant of a security interest or other disposition or encumbrance or the acts thereof (other than a collateral assignment, mortgage, pledge or grant of a security interest to one or more Persons (or one or more representatives or agents thereof) which are lenders to the Company) of all or any portion of a Membership Interest, Unit, Unit Equivalent or warrants, options or other rights to acquire Membership Interests or other interests in the Company.

"Treasury Regulations" means the federal income tax regulations, including any temporary or proposed regulations, promulgated under the Code, in effect on the date hereof. The Board may, in its sole discretion, treat any amendment to such Treasury Regulations as having been in effect on the date hereof; provided that, such amendment does not result in a material change in the rights or obligations of any Member under this Agreement.

"Units" means, as of a given date, the units representing a fractional part of the Membership Interests of the Members and having the rights and obligations specified with respect to Units in this Agreement.

ARTICLE 1
Formation, Name, Purpose, Location, Registered Office

1.1   Formation.  The Company has been formed as a limited liability company pursuant to Maine Law and the Act by the filing of the Company's Articles of

3

Organization on June 23, 1995 with the Secretary of State of the State of Maine ("Secretary of State").

1.2  <u>Name</u>.  The name of the Company is VISION CARE OF MAINE LIMITED LIABILITY COMPANY.

1.3  <u>Purpose</u>.  The Company is organized for all lawful purposes.

1.4  <u>Place of Business</u>.  The principal office of the Company shall be located at 7 Ridgeway Drive, Bangor Maine or at such other or additional locations as may be determined by the Manager.

1.5  <u>Registered Office and Registered Agent</u>.  The address of the Company's registered office shall be Marcus, Clegg & Mistretta, P.A., One Canal Plaza, Suite 600, Portland, Maine 04101. The name of the Company's registered agent shall be Marcus, Clegg, and Mistretta, P.A.  The registered office and registered agent may be changed from time to time as the Managers deem advisable by filing notice of such changes with the Secretary of State.

## ARTICLE 2
### Terms; Dissolution

2.1  <u>Term</u>.  The term of the Company shall continue until the Company is dissolved in accordance with either the provisions of this Operating Agreement or the Act.

2.2  <u>Dissolution</u>.  The Company shall be dissolved upon the occurrence of any of the following events:

(a)  The written agreement of the holder(s) of more than eighty percent (80%) of the Membership Interests (as defined below);

(b)  The sale or other disposition of all or substantially all of the assets of the Company or the permanent cessation of the Company's business operations.

Upon the occurrence of any dissolution hereunder, the affairs of the Company shall be wound up in accordance with Article 10 and, immediately thereafter, the Company shall terminate.

## ARTICLE 3
### Capital

3.1  <u>Member's Capital Contributions</u>.  Each Member shall contribute such amount as is set forth in <u>Schedule A</u> hereto as his, her or its initial capital contribution.

4

3.2  Membership Interests.  The Members shall have the membership interests in the Company specified on Schedule A ("Membership Interests").  Membership interests shall be stated in units ("Membership Units"), with each Member holding the number of Membership Units as are set forth in Schedule A and with the total of Membership Units in the Company being the total number of Membership Units set forth in Schedule A for all Members.  Schedule A shall be amended from time to time to reflect the withdrawal or admission of Members and/or any changes in the Membership Interest held by a Member arising from the permitted transfer of a Membership Units to or by such Member.

3.4  Capital Accounts.  A capital account shall be maintained for each Member, in accordance with generally accepted accounting principles, which shall reflect his, her or its initial capital contribution as set forth in Schedule A, and shall be adjusted and maintained as follows:

(a)  As of the end of each fiscal year of the Company, each Member's opening capital account for such year shall be increased by an amount equal to: (i) the cash and the agreed fair market value of property (net of any liabilities assumed by the Company or to which such property is subject) contributed to the capital of the Company by such Member for such year; and (ii) such Member's allocable share of Company taxable income for such year, including income and gain exempt from tax; and

(b)  As of the end of each fiscal year of the Company, each Member's opening capital account for such year shall be decreased by an amount equal to: (i) the aggregate amount of cash distributions and the agreed fair market value of any property (net of any liabilities assumed by such Member or to which such property is subject) distributed to such Member during each year, (ii) his or her share of expenditures of the Company not deductible and not properly chargeable as capital expenditures; and (iii) his or her share of Company losses for such year.

Provided, however, that if it is necessary to determine the capital account of any Member during the fiscal year, the capital account of the Member shall be determined after giving effect to all allocations of taxable income, gain, and loss attributable to transactions effected prior to the time such determination is made and all distributions of cash theretofore made for such year.

3.5  Change in Tax Law.  Notwithstanding anything to the contrary herein, so long as the Company has only one (1) Member, it is the intention of the Company that it be classified as a disregarded entity for federal income tax purposes.  In the event the Company ever has more than one (1) Member, it is the intention of the Company that it be classified as a partnership for federal income tax purposes and that it conform to the requirements of the Internal Revenue Code with respect to the validity of the allocation of items, income, gain, loss, and tax credits.  In the event of a change in the Internal Revenue Code or Treasury Regulations, the Members hereby agree to consult with tax counsel and advisers to determine whether an amendment to this Agreement is required

and, if it is, to adopt such amendment. The parties do not intend that the Company be classified or treated as a partnership for any other reason.

3.6    Interest on Capital; Loans by or to Members.    No interest or other compensation shall be allowed to any Member with respect to his or her capital account, except his, her or its share of the profits, losses and distributions of the Company as hereinafter provided. The Company shall not make loans to, or borrow from, any Member without the consent of the holders of more than fifty percent (50%) of the Membership Interests.

3.7    Withdrawal of Capital.    Except as may be specifically provided in this Agreement, no Member shall have the right to withdraw from the Company all or any part of his, her or its capital contribution nor shall he, she or it have any right to demand and receive property or cash of the Company in return of his, her or its capital contribution.

3.8    Liability of Members for Repayment of Capital.    No Member shall have any personal liability for the repayment of any capital contribution of any other Member.

## ARTICLE 4
## Profits, Losses and Cash Distributions

4.1    Company Profits, Losses and Cash Distributions.    All profits, losses and distributions of cash or other property from the Company to the Members shall be allocated or distributed in accordance with each Member's Membership Interest set forth on Schedule A, provided that upon the dissolution of the Company all distributions of cash shall be made in accordance with Article 10.

4.2    Priority & Timing.    No Member shall have priority over any other Member with regard to allocations of profit or losses or distributions from the Company. All distributions of Company funds to the Members shall be made at such times as the Manager may determine.

4.3    Tax Allocations.    Tax allocations shall be made in compliance with applicable provisions of the Internal Revenue Code of 1986, as amended, including Code Sections 704(c) and 754, based upon the economic substance of each transaction.

4.4    Tax Distributions.    So long as the Managers have not determined in good faith that a distribution pursuant to this Section 4.4 would be prohibited or create a default or event of default under the Act or any agreement to which the Company is subject, then, to the extent of available cash (as determined by the Managers in their sole discretion), the Managers shall cause the Company to distribute to the Members with respect to each fiscal quarter of the Company an amount of cash which in the good faith judgment of the Managers equals (i) the amount of taxable income of the Company

6

allocable to the Members in respect of such fiscal quarter, multiplied by (ii) a rate equal to the greater of the (A) the rate determined at the time of such distribution by the Members or (B) 40%, with such distribution to be made to the Members in the same proportions that taxable income was allocated to the Members during such fiscal quarter.

## ARTICLE 5
## Rights and Duties of Managers

5.1 <u>Management</u>. Subject to the restrictions on the authority of the Managers, as set forth in Section 5.4 and elsewhere in this Operating Agreement, the Managers are charged with the responsibility and vested with the exclusive authority to manage the Company's business. No Member who is not also a Manager shall have authority nor take any action to bind the Company. Any Member who is not also a Manager who knowingly takes any unauthorized action purportedly on behalf of the Company shall indemnify and hold the Company harmless from any costs or damages incurred by the Company as a result thereof. In furtherance of their authority, Managers are authorized and empowered to perform any and all acts customary or incident to the management of the Company's business. At any time when there is more than one Manager, no Manager is authorized to act independently without prior consultation with and approval by the other Managers by the affirmative, unanimous vote of a majority of the Managers.

5.2 <u>Number, Tenure and Qualifications</u>. The Company shall initially have three 3) Managers who shall be Craig Young, J. Andrew Durkovich, and Curt Young. In the event that Craig Young ceases to serve as a Manager, his successor shall be Bradley P. Young. The number of Managers of the Company may be increased or decreased from time to time by the affirmative vote of Member(s) holding more than eighty percent (80%) of all Membership Interests, but in no instance shall there be less than one (1) nor more than three (3) Managers. No Manager shall have a contractual right independent of this Operating Agreement to such position. Managers shall be elected by the affirmative vote of Members holding at least eighty percent (80%) of the Membership Interests. Managers need not be Members of the Company or natural persons. Each Manager shall hold office until his or her successor shall have been duly elected and qualified in accordance with this Operating Agreement, or until his or her removal, death or resignation.

5.3 <u>Certain Powers of Managers</u>. Without limiting the generality of Section 5.1 and subject to Section 5.4, the Managers shall have power and authority on behalf of the Company:

(a) to acquire property from any party as the Managers may determine. The fact that a Manager or a Member is directly or indirectly affiliated or connected with any such party shall not prohibit the Managers from dealing with that party;

(b) to borrow money for the Company from banks, other lending institutions, or from the Managers, Members, or affiliates of the Manager or Members on such terms as the Managers deem appropriate, and in connection

therewith, to hypothecate, encumber and grant security interests in the assets of the Company to secure repayment of the borrowed sums;

(c)  to purchase liability and other insurance to protect the Company's property and business;

(d)  to hold and own any Company real and/or personal properties in the name of the Company;

(e)  to invest any Company funds on a long term or short term basis (by way of example, but not limitation) in time deposits, short-term governmental obligations, commercial paper or other investments;

(f)  to sell or otherwise dispose of the assets of the Company so long as such disposition is not in violation of or a cause of a default under any other agreement to which the Company may be bound;

(g)  to execute on behalf of the Company all instruments and documents, including, without limitation, checks, drafts, notes and other negotiable instruments; mortgages or deeds of trust; security agreements; financing statements; documents providing for the acquisition, mortgage or disposition of the Company's property; assignments; bills of sale; leases; partnership agreements; operating agreements of other limited liability companies; and any other instruments or documents necessary, in the opinion of the Manager, to the business of the Company;

(h)  to employ accountants, legal counsel, managing agents or other experts to perform services for the Company and to compensate them from Company funds;

(i)  to enter into any and all other agreements on behalf of the Company with any other party for any purpose, in such forms as the Manager may approve; and

(j)  to do and perform all other acts as may be necessary or appropriate to the conduct and management of the Company's business.

Unless authorized to do so by this Operating Agreement or by the Managers of the Company, no attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose. No Member shall have any power or authority to bind the Company unless the Member has been authorized by the Managers to act as an agent of the Company in accordance with the previous sentence.

5.4    <u>Actions Requiring Vote of Eighty Percent (80%) of all Membership Interests</u>. Notwithstanding anything in this Agreement to the contrary, without obtaining the prior written consent of the holders of eighty percent of the Membership Interests in the Company, the Company shall not nor shall it cause or permit any of its Subsidiaries to:

      (i)    approve its annual budget (including operating and capital plans), business plan and any related material business policies, and any material amendments and deviations from any of the foregoing resulting from management decisions;

      (ii)    effect any Change of Control;

      (iii)    dispose of all or substantially all of its assets of the Company, or the amalgamation, consolidation, merger, share exchange or entry into any business combination by it with another Person;

      (iv)    authorize, issue, redeem or repurchase any Membership Interests, Units, or other rights relating to equity securities or debt securities of the Company or its Subsidiaries;

      (v)    admit any new Members to the Company or alter, change or amend the designations of any Member;

      (vi)    authorize or approve the transfer of any Membership Interests, Units or other rights relating to equity securities or debt securities of the Company or its Subsidiaries;

      (vii)    authorize any recapitalization or exchange of securities of the Company, and any subdivision (by unit split or otherwise) or any combination (by reverse unit split or otherwise) of any outstanding Units

      (viii)    declare dividends or distributions of any kind other than the Mandatory Distribution or distributions pursuant to Section 5.5;

      (ix)    approve, amend or alter any borrowings or financial accommodation in excess of $500,000;

      (x)    appoint or remove a Person as its auditor, or make any material change to its accounting policies other than as is required to comply with GAAP;

      (xi) authorize or approve any liquidation, bankruptcy, dissolution, recapitalization, reorganization, or assignment to its creditors, or any similar transaction (or adopt a plan to do any of the foregoing);

(xii)    amend, alter, repeal, change or grant any waiver of (i) the provisions of the Articles or this Agreement and (ii) the articles of incorporation, by-laws or equivalent constituent documents of any Subsidiaries of the Company;

(xiii)    purchase or otherwise acquire (by merger, consolidation, share exchange, business combination or otherwise) any stock or equity interests in or of any other Person, or any assets of any other Person, or any business (or a substantial part of a business), whether in one transaction or a series of related transactions;

(xiv)    establish or enter into any partnership or joint venture relationships with any other Person;

(xv)    create any Subsidiaries;

(xvi)    settle any litigation, arbitration, or administrative proceeding involving amounts in excess of $25,000;

(xvii)    enter into or amend or modify, in any material respect, any contract that is material to any such entity including any employment agreements with a term of more than one year or compensation in excess of $100,000;

(xviii)    appoint or enter into any agreement with any financial or investment banking advisor or similar consultant;

(xix)    approve, amend, alter or enter into any agreement or transaction, directly or indirectly, with a Member, Manager or any of its Affiliates;

(xx)    increase the number of Membership Interests or Units reserved for issuance under any equity option or similar plan or approval of any equity option or similar plan for the benefit of employees of the Company or any of its Subsidiaries;

(xxi)    grant any registration rights;

(xxii)    create any committee of the Managers (or equivalent body), or delegation of any powers to any such committee or any other Person; and

(xxiii)    enter into, assume or become bound by any contract to do any of the foregoing or otherwise attempts to do any of the foregoing, either directly or indirectly.

5.5  Liability for Certain Acts. Each Manager shall exercise his or her powers and discharge his or her duties in good faith with a view to the interests of the Company and its Members with that degree of diligence, care and skill that ordinarily prudent persons would exercise under similar circumstances in like positions.  A Manager who so performs the duties as Manager shall not have any liability by reason of being or having been a Manager of the Company.  The Manager does not, in any way, guarantee the return of the Members' capital contributions or a profit for the Members from the operations of the Company.

5.6  Manager and Members Have No Exclusive Duty to Company.  No Manager shall be required to manage the Company as his or her sole and exclusive function and he or she (and any Manager and/or Member) may have other business interests and may engage in other activities in addition to those relating to the Company.  Neither the Company nor any Member shall have any right, by virtue of this Operating Agreement, to share or participate in such other investments or activities of any Manager and/or Member or to the income or proceeds derived therefrom.  Neither the Manager nor any Member shall incur any liability to the Company or to any of the Members as a result of engaging in any other business or venture.

5.7  Bank Accounts.  The Managers may from time to time open bank accounts in the name of the Company, and the Managers shall be the sole signatory thereon, unless the Managers determine otherwise.

5.8  [Reserved]

5.9  Resignation.  Any Manager of the Company may resign at any time by giving written notice to the Company or to the Members of the Company.  The resignation of any Manager shall take effect upon receipt of notice thereof or at such later time as shall be specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.  The resignation of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of such Member.

5.10  Removal.  At a meeting called expressly for that purpose, all or any lesser number of Managers may be removed at any time, with or without cause, by the affirmative vote of Members holding more than eighty percent (80%) of the Membership Interests. The removal of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

5.11  Vacancies.  Any vacancy occurring for any reason in the number of Managers of the Company may be filled by the affirmative vote of Members holding more than eighty percent (80%) of the Membership Interests.  A Manager elected to fill a vacancy shall be elected for the unexpired term of his predecessor in office and shall hold office until the expiration of such term and until his successor shall be elected and shall qualify or until his earlier death, resignation or removal.

12

5.12  <u>Compensation</u>.  The compensation of the Managers shall be fixed from time to time by an affirmative vote of Member(s) holding more than eighty percent (80%) of the Membership Interests.   No Manager shall be prevented from receiving such compensation by reason of the fact that he is also a Member of the Company.

5.13  <u>Right to Rely on the Manager</u>.   Any person or entity dealing with the Company may rely (without duty of further inquiry) upon a certificate signed by any Manager as to:

    (a)  the identity of any Manager or any Member;

    (b)  the existence or nonexistence of any fact or facts which constitute a condition precedent to acts by any Manager or which are in any other manner germane to the affairs of the Company;

    (c)  the persons who are authorized to execute and deliver any instrument or document of the Company; or

    (d)  any act or failure to act by the Company or any other matter whatsoever involving the Company or any Member.

## ARTICLE 6
### Admission, Rights and Obligations of Members

6.1  <u>Admission of New Members</u>.   By this instrument, C. Young hereby withdraws as a Member, and admits Marcia Young, Curt Young and Bradley P. Young as new Members of the Company.

6.2  <u>Limitation of Liability</u>.  Each Member's liability shall be limited as set forth in this Operating Agreement, the Act and other applicable law.

6.3  <u>Company Debt Liability</u>.  A Member will not be personally liable for any debts or losses of the Company beyond the Member's respective capital contributions.

6.4  <u>List of Members</u>.  Upon written request of any Members, the Manager shall provide a list showing the names, addresses and Membership Interests of all Members.

6.5  <u>Company Books</u>.  The Managers shall maintain and preserve, during the term of the Company, and for six (6) years thereafter, all accounts, books and other relevant Company documents.   Upon reasonable request, each Member shall have the right, during ordinary business hours, to inspect and copy such Company documents at the requesting Member's expense.

6.6  <u>Priority and Return of Capital</u>.  No Member shall have priority over any other

Member either as to the return of capital contributions or as to net profits or losses of the Company; provided that this Section shall not apply to approved loans (as distinguished from capital contributions) which a Member has made to the Company.

## ARTICLE 7
### Meetings of Members

7.1 <u>Meetings</u>. Meetings of the Members for any purpose may be called by any Manager or by any Member(s) holding at least ten percent (10%) of the Membership Interests.

7.2 <u>Place of Meetings</u>. The Members may designate any place, either within or outside the State of Maine, as the place of meeting for any meeting of the Members. If no designation is made, the place of meeting shall be the principal executive office of the Company in the State of Maine.

7.3 <u>Notice of Meetings</u>. Written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than three (3) nor more than sixty (60) days before the meeting, either personally or by mail, by or at the direction of the Managers or person calling the meeting, to each Member entitled to vote at such meeting. If mailed, such notice shall be deemed to be delivered two (2) calendar days after being deposited in the United States mail, addressed to the Member at its address as it appears on the books of the Company, with postage thereon prepaid.

7.4 <u>Meeting of all Members</u>. If all of the Members owning Membership Interests shall meet at any time and place and consent to the holding of a meeting at such time and place, such meeting shall be valid without call or notice, and at such meeting lawful action may be taken.

7.5 <u>Record Date</u>. For the purpose of determining Members entitled to notice of or to vote at any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any distribution, or in order to make a determination of Members for any other purpose, the date on which notice of the meeting is mailed or the date on which the resolution declaring such distribution is adopted, as the case may be, shall be the record date for such determination of Members. When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof.

7.6 <u>Quorum</u>. Member(s) holding more than eighty percent (80%) of the Membership Interests, represented in person or by proxy, shall constitute a quorum at any meeting of Members. In the absence of a quorum at any such meeting, a majority of the Membership Interests so represented may adjourn the meeting from time to time for a period not to exceed sixty (60) days without further notice. However, if the adjournment

14

is for more than sixty (60) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each Member of record entitled to vote at the meeting. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally noticed. The Members present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal during such meeting of that number of Membership Interests whose absence would cause less than a quorum.

      7.7 <u>Manner of Acting</u>. If a quorum is present, the affirmative vote of Member(s) holding more than eighty percent (80%) of the Membership Interests represented in person or by proxy shall be the act of the Members, unless the vote of a greater or lesser proportion or number is otherwise required by the Act, by the Articles of Organization, or by this Operating Agreement. Unless otherwise expressly provided herein or required under the applicable law, only Members owning Membership Interests may vote or consent upon any such matter and their Membership Interest, vote or consent, as the case may be, shall be counted in the determination of whether the requisite matter was approved by the Members.

      7.8 <u>Proxies</u>. At all meetings of Members a Member owning a Membership Interest may vote in person or by proxy executed in writing by the Member or by a duly authorized attorney-in-fact. Such proxy shall be filed with the Manager of the Company before or at the time of the meeting. No proxy shall be valid after eleven (11) months from the date of its execution, unless otherwise provided in the proxy.

      7.9 <u>Action by Members without a Meeting</u>. Action required or permitted to be taken at a meeting of Members may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed by Members entitled to vote who hold at least eighty percent (80%) of the Membership Interests in the Company, and delivered to the Managers of the Company for inclusion in the minutes for filing with the Company records. Action taken under this Section is effective when Members who are entitled to vote and who hold at least eighty percent (80%) of the Membership Interests in the Company have signed the consent, unless the consent specifies a different effective date. The record date for determining Members entitled to take action without a meeting shall be the date the first Member signs a written consent.

      7.10 <u>Waiver of Notice</u>. When any notice is required to be given to any Member, a waiver thereof in writing signed by the person entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

ARTICLE 7A
<u>Indemnification and Exculpation</u>

      <u>7A. 1 Performance of Duties; No Liability of Members, Managers and Officers</u>. No Member (including any Manager who is a Member) shall have any duty to the

Company or any Member of the Company except as expressly set forth in the Act, herein or in other written agreements. No Member (including any Manager who is a Member) or Officer of the Company shall be liable to the Company or to any Member for any loss or damage sustained by the Company or to any Member, unless the loss or damage shall have been the result of gross negligence, fraud or intentional misconduct by the Member or Manager in question (the Members, Managers, and Officers of the Company are referred to in this Article as "Person(s)").. In performing such Person's duties, each such Person shall be entitled to rely in good faith on the provisions of this Agreement and on information, opinions, reports or statements (including financial statements and information, opinions, reports or statements as to the value or amount of the assets, liabilities, profits or losses of the Company or any facts pertinent to the existence and amount of assets from which Distributions to Members might properly be paid) of the following other Persons or groups: one or more Officers or employees of the Company; any attorney, independent accountant, appraiser or other expert or professional employed or engaged by or on behalf of the Company, the Board or any committee of the Board; or any other Person who has been selected with reasonable care by or on behalf of the Company, the Board or any committee of the Board in each case as to matters which such relying Person reasonably believes to be within such other Person's competence. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in the Act. No Member (including any Manager who is a Member), Manager or Officer of the Company shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation or liability of the Company, whether that liability or obligation arises in contract, tort or otherwise, solely by reason of being a Member, a Manager or Officer of the Company or any combination of the foregoing.

7A.2  Confidentiality. (a) All materials and information obtained by any Member together with all other confidential or proprietary information of the Company (such materials and information collectively, the "Confidential Information"), shall be kept confidential and shall not be disclosed to any third party by such Member, in their capacity as a Member of the Company, except (a) information which is obtained by a Member from a third party who is not known by such Member to be prohibited from disclosing the information to such Member by a contractual, legal or fiduciary obligation to the Company, (b) information which is or becomes publicly available (other than as a result of disclosure by a Member in violation hereof or a third party violation of such third party's contractual, legal or fiduciary obligation to the Company); (c) information which is independently developed, discovered or arrived at by a Member without use of Confidential Information, (d) if applicable, to such Member's Representatives on a need-to-know-basis, (e) to any Person to which such Member makes a bona fide offer to Transfer any Units of the Company; provided that, the prospective transferee shall agree to be bound by a confidentiality agreement for the benefit of the Company containing provisions substantially similar to the provisions of this Section, (f) in any report, statement, testimony or other submission to any governmental authority having or claiming to have jurisdiction over such Member or (g) in order to comply with any law, rule, regulation, or order applicable to a Member, or in response to any summons, subpoena or other legal process or formal or informal investigative demand issued to such recipient in the course of any litigation, investigation or administrative proceeding.

16

In the event that any party hereto or any of its Representatives becomes legally compelled by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar judicial or administrative process to disclose any Confidential Information, the disclosing party shall provide the Company with prompt prior written notice of such requirement and shall cooperate with the Company, at the Company's expense, to obtain a protective order or similar remedy to cause such Confidential Information not to be disclosed, including interposing all available objections thereto, such as objections based on settlement privilege. In the event that such protective order or other similar remedy is not obtained, the disclosing party shall furnish only that portion of such Confidential Information that has been legally compelled to be furnished. Any Member who is an employee of, or provides services to, the Company or its Subsidiaries shall, during such employment or term of service, disclose Confidential Information only for the benefit of the Company and in accordance with any restrictions placed on its disclosure by the Company.

Each Member acknowledges and agrees that the covenants and obligations of such Member with respect to confidentiality herein relate to special, unique and extraordinary matters and that a violation or threatened violation of any of the terms of such covenants or obligations will cause the Company irreparable injury for which adequate remedies are not available at law. Therefore, each Member agrees, to the fullest extent permitted by applicable law, that the Company shall be entitled to an injunction, restraining order or such other equitable relief (without the requirement to post bond) restraining such Member from committing any violation of the covenants or obligations contained in this section. These injunctive remedies are cumulative and are in addition to any other rights and remedies the Company may have at law or in equity.

    7A. 3  <u>Right to Indemnification from the Company</u>. Subject to the limitations and conditions as provided in this <u>Article</u>, each Person who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or arbitrative (hereinafter a "<u>Proceeding</u>"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that such Person, or a Person of which such Person is the legal representative, is or was a Member, Manager or Officer shall be indemnified by the Company to the fullest extent permitted by applicable law, as the same exists or may hereafter be amended (but, in the case of any such amendment, only to the extent that such amendment permits the Company to provide broader indemnification rights than said law permitted the Company to provide prior to such amendment) against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable expenses (including, without limitation, reasonable attorneys' fees) actually incurred by such Person in connection with such Proceeding, appeal, inquiry or investigation (for purposes of this section, each an "<u>Expense</u>"), unless and to the extent that such Expense shall have been the result of gross negligence, fraud or intentional misconduct by such Person, and indemnification under this <u>Article</u> shall continue as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder. The rights granted pursuant to this <u>Article</u> shall be deemed contract rights, and no amendment, modification or repeal of this <u>Article</u> shall have the effect of limiting or denying any such rights with respect to

17

actions taken or Proceedings, appeals, inquiries or investigations arising prior to any amendment, modification or repeal.

7A. 4  Advance Payment.  The right to indemnification conferred in this Article shall include the right to be paid or reimbursed by the Company the reasonable expenses incurred by a Person (other than a Manager or an Officer of the Company or any of its Subsidiaries thereof in respect of claims by the Company or any of its Subsidiaries thereof against such Manager or Officer in such Manager's or such Officer's capacity as such) of the type entitled to be indemnified who was, is or is threatened to be, made a named defendant or respondent in a Proceeding in advance of the final disposition of the Proceeding and without any determination as to the Person's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred by any such Person in advance of the final disposition of a Proceeding shall be made only upon delivery to the Company of a written affirmation by such Person of his or her good faith belief that he has met the standard of conduct necessary for indemnification under Article and a written undertaking, by or on behalf of such Person, to repay all amounts so advanced if it shall ultimately be determined that such indemnified Person is not entitled to be indemnified under this Article or otherwise.

7A. 5  Indemnification of Employees and Agents.  The Company, at the direction of the Managers, may indemnify and advance expenses to an employee or agent of the Company to the same extent and subject to the same conditions under which it may indemnify and advance expenses under this Article for the benefit of Managers or Members.

7A. 6  Nonexclusivity of Rights.  The right to indemnification and the advancement and payment of expenses conferred in this Article shall not be exclusive of any other right that a Member, Manager, Officer or other Person indemnified pursuant to this Article may have or hereafter acquire under any law (common or statutory) or provision of this Agreement.

7A. 7  Insurance.  The Company may, but shall not be obligated to, purchase and maintain insurance, at its expense, to protect itself and any Member, Manager, Officer or agent of the Company who is or was serving at the request of the Company as a member, manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of a foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any expense, liability or loss, whether or not the Company would have the power to indemnify such Person against such expense, liability or loss under this Article..

7A. 8  Savings Clause.  If this Article or any portion hereof shall be invalidated on any ground by an arbitrator to whom the parties have assigned the matter or any court of competent jurisdiction, then the Company shall nevertheless indemnify and hold harmless each Person indemnified pursuant to this Article as to costs, charges and expenses (including reasonable attorneys' fees), judgments, fines and amounts paid in settlement with respect to any such Proceeding, appeal, inquiry or investigation to the full

extent permitted by any applicable portion of this Article that shall not have been invalidated and to the fullest extent permitted by applicable law.

## ARTICLE 8
## Withdrawal; Liquidation of Membership Interest

8.1 Withdrawal. A person shall cease to be a Member of the Company upon the occurrence of any of the events specified in the Act ("Withdrawal"). A Member shall have the right to withdraw from the Company at any time and for any reason, but shall not be entitled to any payment for his, her or its Membership Interest except as mutually agreed by the Company, or as otherwise provided herein.

8.2 Liquidation of Withdrawn Member's Membership Interest. Following the Withdrawal of a Member, the remaining Members (in proportion to their Membership Interests), or at their election with the approval of the Manager, the Company, shall have the option, but not the obligation, to purchase and thereby liquidate the Membership Interest of such withdrawn Member in accordance with this Article 8. Notice of such election shall be made by written notice delivered to the withdrawn Member or the withdrawn Member's personal representative within sixty (60) days of the Withdrawal.

8.3 Valuation of Company Interest. If the remaining Members (or the Company) elect to liquidate the Membership Interest of a withdrawn Member, negotiations shall be undertaken between (a) the remaining Members (or the Company) and (b) the withdrawn Member or the personal representative of the withdrawn Member to establish the value of the withdrawn Member's Membership Interest. If the parties are not able to reach agreement as to the value of the withdrawn Member's Membership Interest within ninety (90) days after the remaining Members give notice of their election to liquidate the Membership Interest of the withdrawn Member, then the value of such Membership Interest shall be determined as hereinafter provided. The remaining Members, as a group (or the Company), and the withdrawn Member or the withdrawn Member's personal representative, shall forthwith each appoint an appraiser who, in turn, shall jointly appoint an arbitrator. The appraisers shall submit to the arbitrator their separate appraised values of the deceased Member's Membership Interest based upon whatever methods of valuation each appraiser considers most appropriate to reflect the fair market value. The arbitrator, in his sole discretion, shall choose one of the appraised values, or any value in between the two appraised values, as the value of the withdrawn Member's Membership Interest. Such determination shall be binding upon all parties, provided, however, that the remaining Members (or the Company) may withdraw their election to liquidate the Membership Interest of a withdrawn Member at any time.

8.4 Payments; Hold Harmless. If the remaining Members (or the Company) elect to liquidate the Membership Interest of a withdrawn Member, then within sixty (60) days after the value of the withdrawn Member's Membership Interest is determined, the remaining Members (or the Company) shall pay to the withdrawn Member or the withdrawn Member's personal representative an amount equal to twenty percent (20%)

of the value of the withdrawn Member's Membership Interest and shall deliver to such withdrawn Member or withdrawn Member's personal representative a promissory note in an amount equal to the unpaid value of the withdrawn Member's Membership Interest. Such promissory note shall provide for equal annual payments over a period of four (4) years from the date of delivery and shall bear interest at a fixed annual rate equal to the then current prime rate (as published in the Money Rates section of the Wall Street Journal, or if not so published, then the prime rate published in a generally recognized source determined by the Company), with the right of prepayment without penalty. Additionally, the Company and the remaining Members shall indemnify and hold the withdrawn Member or the withdrawn Member's estate harmless from any and all liabilities of the Company guaranteed by the withdrawn Member whose Membership Interest is liquidated by the Company hereunder.

ARTICLE 9
Restrictions on Transfer of Membership Interest; Admission of New Members


9.1 No Transfer, Sale, Assignment, Pledge or Encumbrance of Interests. No Member may transfer, sell, assign, pledge or encumber all or any part of his or her Membership Interest, in any manner, whether voluntarily or involuntarily, by operation of law or otherwise, without the written consent of the holder(s) of more than eighty percent (80%) of the Membership Interests and compliance with all of the provisions of this Article 9..

9.2 Restriction on Sale or Other Transfers. In case any Member, his, her or its personal representative, administrator, or assignee, desires to sell, transfer or otherwise dispose of all or any part of his, her or its Membership Interest, he, she or it shall first notify the Company and the other Members in writing, stating the percentage of Membership Interest he, she, or it desires to sell and the bona fide price at which he, she or it is able to sell, transfer or otherwise dispose of it and the name of the person to whom they are to be sold or transferred, and, for a period of sixty (60) days following the receipt of such notice by the Members, the Company, acting by an affirmative vote of the Member(s) holding more than eighty percent (80%) of the Membership Interests, shall have an option to liquidate such Membership Interest at the price so named. If the Company does not exercise the Company's option within this sixty (60) day period, the other Members in proportion of their holdings, or if only one of them is interested, he, she or it alone, within thirty (30) days after the Company does not elect to exercise its option, shall have an option to purchase the Membership Interest at the price so named. No Membership Interest of the Company shall be sold, nor shall any Membership Interest be transferred upon the records of the Company, nor shall any purchaser or assignee thereof have any right to demand and require the transfer of any Membership Interest of the Company attempted to be sold or transferred to him, her or it, until after notice given in accordance with this section and until after the expiration of the aforesaid periods of sixty (60) and thirty (30) days, during which the Company's and the Members' options to purchase such Membership Interests shall remain in full force and effect. If neither the Company nor the other Members decide to exercise their options to acquire the

Membership Interests, the Member may sell and assign the percentage of Membership Interests mentioned in the notice to the person or entity named therein, but only in strict compliance with the terms stated in the notice, and only if Members owning at least eighty percent (80%) of the Membership Interests consent. However, if the Member shall fail to make such sale or assignment within sixty (60) days following the expiration of the time periods provided herein for exercise of the option by the Company and the other Members, such Membership Interest shall again become subject to all the restrictions of the provisions of this Section 9.2. The Company and the other Members may waive in writing the aforesaid periods of sixty (60) and thirty (30) days and authorize the sale, assignment and transfer to the person named in the notice before the expiration of such periods.

9.3  Registration.  Notwithstanding the provisions of Section 9.2 above, no transfer of a Membership Interest may occur unless: (i) a Registration Statement under the Securities Act of 1933 is in effect with respect to the Membership Interest; or (ii) an opinion is furnished by counsel satisfactory to the Company that the sale, transfer or other disposition does not require registration of the Membership Interest.

9.4  Admission of New Members.  New Members shall be admitted upon the affirmative vote the holder(s) of more than eighty percent (80%) of the Membership Interests, and shall receive such Membership Interest, for such capital contribution, as the Members may determine. Each new Member, whether receiving a newly created Membership Interest or a transferred Membership Interest, must agree in writing to be bound by the terms of this Operating Agreement as a condition to becoming a Member.

## ARTICLE 10
### Dissolution and Winding Up

10.1  _Dissolution_.  Upon an event triggering dissolution, the Company shall cease to carry on its business, except insofar as may be necessary for the winding up of business, but its separate existence shall continue until a certificate of cancellation has been filed with the Secretary of State or until a decree dissolving the Company has been entered by a court of competent jurisdiction.

10.2  _Winding Up; Liquidation and Distribution of Assets_.

(a)  Upon dissolution, the Managers shall immediately proceed to wind up the affairs of the Company in accordance with the requirements of the Act and other applicable law.  In furtherance of the winding up of the Company, the Manager shall:

(i)  sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Manager may determine to distribute any assets to Members in kind);

(ii)  discharge or make reasonable provision for all liabilities of the Company, including liabilities to Members who are also creditors, other than liabilities to Members for distributions and the return of capital, and establish such reserves as may be reasonably necessary to provide for contingent liabilities of the Company (for purposes of determining the capital accounts of the Members, the amount of such reserves shall be deemed to be an expense of the Company).

(iii)  distribute the remaining assets of the Company in the following order of priority:

(1)  To each Member, with respect to the cumulative amount of all accrued but unpaid pre-dissolution distributions for which the Company is liable to the Member, the amount of such liability.

(2)  To each Member, with respect to his, her or its unreturned capital contribution, an amount equal to the positive balance (if any) in his or her capital account (as determined after taking into account all capital account adjustments for the Company's taxable year during which the liquidation occurs) or, if the assets available to be distributed hereunder are insufficient to cover the aggregate of all Members' positive balances, a

proportionate amount based upon the relative positive balances of the Members; and

(3)   To each Member, with respect to his, her or its Membership Interest, a proportionate share of the remaining assets equal to his or her Membership Interest.

(b)  The Members shall cause an accounting to be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution.

(c)  If any assets of the Company are distributed in kind, the net fair market value of such assets as of the date of dissolution shall be determined by independent appraisal or by agreement of the Members.  Such assets shall be deemed to have been sold to the Members in proportion to their Membership Interest as of the date of dissolution for their fair market value, and the capital accounts of the Members shall be adjusted to reflect such deemed sale.

(d)  Notwithstanding anything to the contrary in this Agreement, upon a liquidation, if any Member has a deficit capital account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which liquidation occurs), such Member shall have no obligation to make any capital contributions, and a negative balance of such Member's capital account shall not be considered a debt owed by such Member to the Company or to any other person for any purpose whatsoever.

10.3  Certificate of Cancellation.  Upon completion of the winding up, liquidation and distribution of the assets, the Company shall be deemed terminated and the Manager shall forthwith file with the Secretary of State a certificate of cancellation.  Thereafter, the Manager, as liquidating trustees, shall have authority to distribute any Company property discovered after termination, convey real estate and take such other action as may be necessary on behalf of and in the name of the Company.

10.4  Return of Capital Contribution - Non-recourse.  Except as provided by law or as expressly provided in this Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of his, her or its capital contribution.  If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the capital contribution of a Member, such Member shall have no recourse against any other Member.

ARTICLE 11
Amendment

11.1  This Agreement may be amended from time to time only upon the written consent of the holder(s) of more than eighty percent (80%) of the Membership Interests.

ARTICLE 12
Miscellaneous

12.1  Notices.  All notices, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given on the date delivered in person to the party to whom notice is to be given, or on the second business day after mailing if mailed to the last known address of the party to whom notice is to be given by registered or certified mail, postage prepaid, return receipt requested.

12.2  Entire Agreement.  This Agreement constitutes the entire agreement between the parties with respect to the Company, and there are no agreements, understandings, warranties or representations between the parties, with respect to the Company except as set forth herein.

12.3  Binding Effect.  This Agreement shall inure to the benefit of and bind the respective successors and assigns of the parties.

12.4  Counterparts.  This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed an original, but all of which together shall constitute one and the same instrument.

12.5  Construction.  As used in this agreement, the singular number shall include the plural, the plural the singular, and the use of one gender shall be deemed applicable to all genders.  Captions are inserted only as a matter of convenience and in no way limit, define or extend the scope of this Agreement.

12.6  Applicable Law.  This Agreement shall be governed in accordance with the laws of the State of Maine.

12.7  Severability.  If any provision of this Agreement is determined to be invalid or unenforceable, it shall not affect the validity or enforceability of the remaining provisions hereof.

[signatures on following page]


IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals on the day, month and year first above written.

WITNESS:

_____          _____
                                          Craig W. Young

SCHEDULE A

Membership Interests

| Member | No. Units | % Interest | Capital Contribution |
|---|---|---|---|
| Marcia Young | 25 | 25% | $100 |
| Bradley P. Young | 24 | 24% | $100 |
| Curt Young | 51 | 51% | $100 |

# JOINDER OF MARCIA YOUNG, BRADLEY YOUNG, AND CURT YOUNG
## AS MEMBERS OF
## VISION CARE OF MAINE, LIMITED LIABILITY COMPANY

The undersigned hereby execute this Joinder, to be effective as of December 28, 2012, acknowledging the grant of Membership Interests to them effective as of said date, and evidencing their consent and agreement to the terms of the Amended and Restated Operating Agreement of Vision Care of Maine, Limited Liability Company.

WITNES;

_____        _____
                                        Bradley P. Young

_____        _____
                                        Curt Young

_____        _____
                                        Marcia Young

## TRANSFER OF MEMBERSHIP INTERESTS AND
## AMENDMENT TO OPERATING AGREEMENT

WHEREAS, the sole members of Vision Care of Maine, Limited Liability Company (the "Company") are Marcia Young, an individual resident of Maine, Bradley P. Young, an individual resident of *PRESQUE ISLE* and Curt Young, an individual resident of *BANGOR*, Maine; and

WHEREAS, Marcia Young and Brad Young wish to gift the entirety of the membership interests in the Company to Curt Young such that Curt Young becomes the sole member of the Company; and

WHEREAS, Curt Young desires to accept such gift.

NOW THEREFORE, the Company, Marcia Young, Brad Young and Curt Young hereby agree and acknowledge as follows:

1.     Gift of Membership Interest: Marcia Young, being the owner and holder of twenty five percent (25%) of the issued and outstanding membership units in the Company, and Bradley P. Young, being the owner and holder of twenty four percent (24%) of the issued and outstanding membership units in the Company, each hereby unconditionally and irrevocably transfer, assign and convey, without representations or warranties of any kind, and without recourse, the entirety of their membership units to Curt Young.

2.     Acceptance of Gift: Curt Young hereby accepts the transfer referenced in section 1 above and after giving effect to the transfer in section 1 above, Schedule A to the Company's Operating Agreement shall be amended to read as follows:

| Name of Member | Membership Interests |
|---|---|
| Curt Young | 100% |

3.     Consent and Waiver: The Company hereby consents to the transfer described in section 1 above and all parties hereby waive any and all provisions of the Company's Operating Agreement that impose any restrictions on the transfer of membership interests (including without limitation, Section 9.3 of the Company's Operating Agreement) that are inconsistent with the terms hereof.

4.     No Other Amendments: The undersigned, now being all of the Members of the Company, hereby agree, acknowledge and certify that this document is hereby adopted by the Members of the Company, as of the date set forth below, and that all other terms and conditions of the original Operating Agreement for the Company for which this instrument is intended, shall remain unchanged.

IN WITNESS WHEREOF, the undersigned have executed and delivered this instrument as of this 12th day of April, 2018.

WITNESS:

_____

Marcia Young

_____

Bradley P. Young

_____

Curt Young

VISION CARE OF MAINE,
LIMITED LIABILITY COMPANY

By: _____
Its: _MGR_
Printed name: _Curt Young_

**VISION CARE OF MAINE, LIMITED LIABILTY COMPANY**

**SCHEDULE A**

**As of April 12, 2018**

**Membership Interests**

| | |
|---|---|
| **Curt Young** | **100%** |